(No. 78445.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LEONARD KIDD, Appellant.

*Opinion filed September 18, 1997.—Rehearing denied December 1, 1997.*

96

Rita A. Fry, Public Defender, of Chicago (Andrea Monsees, Assistant Public Defender, of counsel), for appellant.

James E. Ryan, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee G. Goldfarb and Sally L. Dilgart, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

Upon remand of this cause to the circuit court of Cook County for a new trial (*People v. Kidd*, 147 Ill. 2d 510 (1992)), a jury found the defendant, Leonard Kidd, guilty of one count of arson and 10 counts of murder in the deaths of 10 children who died as the result of a fire on October 28, 1980, in a residential building comprised of five apartments. At a separate sentencing hearing the same jury found defendant eligible for a death sentence and thereafter, upon consideration of aggravating and mitigating circumstances, determined that there were no mitigating circumstances sufficient to preclude the imposition of a death sentence. At the phase of his trial in which his guilt was determined, defendant represented himself, and the trial court appointed the public defender as standby counsel. However, at both phases of

the sentencing hearing, defendant wished to be, and was, represented by the public defender, who filed a post-trial motion seeking a judgment of acquittal or, in the alternative, a new trial and a new sentencing hearing. At the hearing on the post-trial motion, conducted on December 16, 1994, defendant's counsel tendered to the court three *pro se* post-trial motions by defendant for a new trial. Following that hearing, the trial court denied defendant's post-trial motions, including that filed by counsel as well as those proffered by defendant *pro se*, and sentenced him to death accordingly upon the convictions of murder. The cause comes directly to this court for review (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603). Defendant presents for our consideration 13 issues, many of which consist of numerous subissues. We affirm the judgment of the circuit court.

Initially, defendant contends that this cause should be remanded for a new trial because he was taking psychotropic drugs "under medical direction" during trial and was entitled to a fitness hearing but did not receive one. Upon this court's remand of this cause for retrial through the conclusion on September 14, 1994, of the aggravation and mitigation phase of defendant's sentencing hearing, section 104—21(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—21(a) (West 1992)) provided in relevant part that "[a] defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication." However, no hearing is required where the defendant's right to a fitness hearing pursuant to section 104—21(a) is not established (*People v. Britz*, 174 Ill. 2d 163, 196 (1996)) and the trial court has not abused its discretion in concluding that no *bona fide* doubt of unfitness is present. *People v. Kinkead*, 168 Ill. 2d 394, 411 (1995). We note that defendant appears to make no claim that the

trial court so abused its discretion as to any *bona fide* doubt of fitness.

In the first of defendant's *pro se* post-trial motions, he makes, among others, the following two assertions: (1) "At the time of the trial I Leonard Kidd was using drugs. Also befor [*sic*] the trial I had some weed" and (2) "With the coc [*sic*] I had in me I did not understand everything was going on and I did not no [*sic*] about the law." In the third of his *pro se* post-trial motions, he asserts,

"1. Not only in Judge Schreier [*sic*] courtroom [where the instant case was tried] but also in Judge Christy Berkos [*sic*] courtroom [where an unrelated case against the defendant was tried] I was on drugs.

2. The pysch medication I was on would always have me feeling sleep [*sic*] & I did tell Judge Berkos I did not understand everything was going on when I was in his courtroom.

3. When I was doing drugs it would be cocaine or weed. The case's [*sic*] was to [*sic*] much on my mind."

At the hearing on his post-trial motion, the trial court expressed the wish that defendant testify under oath concerning the allegations he had made in his *pro se* motions so that a determination of credibility could be made for the record. Testifying that during the trial he was using marijuana and cocaine, defendant added, "And time that I wasn't using that, I was, I would be taking my Synaquan (Phonetic) before I come over here and it make me drowsey [*sic*] a lot of times." In response to the defendant's claim that he was "high" on drugs during his trial in the instant case, he named the drugs he used as follows: "Cocaine, marijuana. When I didn't have that I used my Synaquan." Although defendant indicated during his testimony that he had taken the drugs prior to being searched before being brought to court, he subsequently testified that he had had the drugs in his mouth when he was searched prior to being brought to court and that when he had arrived at the

courtroom, he had used "cocaine and reefer in the washroom." Defendant stated that he had obtained the cocaine and "reefer" he used "[t]hrough the jail" from inmates. He described the effects of marijuana and cocaine upon him: "Had me high enough lost my mind, if you want to know what that is."

At the conclusion of defendant's testimony, the trial court found that his testimony "lacks any credibility" and that "[i]t is just a ploy, a maneuver, a machination to try to undue [*sic*] this conviction." The trial court found further as follows:

> "[B]ecause defendant lacks credibility that in my judgment he was not using drugs during the trial in this Court, and I further find that he exhibited absolutely no sign of drug use.
>
> He was competent, he was totally mentally fit, he was as sober as anyone in the Courtroom, and he didn't do a bad job as his own lawyer.
>
> And he could not have done as well as he did under the influence of drugs."

In support of defendant's position that he was wrongfully denied a fitness hearing to which he was entitled pursuant to section 104—21(a), he maintains in his brief to this court that in testimony during his motion for a new trial the fact emerged that he was taking the "prescribed antidepressant[ ] Sinequan." However, absent from the record in the trial court is any evidence that the Sinequan defendant testified to having taken was prescribed for him or was in any way taken, as section 104—21(a) expressly requires, "under medical direction." A defendant must be receiving psychotropic drugs "under medical direction" to be entitled to a hearing on the issue of his fitness while under medication. By virtue of having failed to satisfy this element of section 104—21(a), defendant has necessarily failed to establish his entitlement to a fitness hearing with regard to his asserted taking of Sinequan. Hence, no new trial is warranted on this basis.

In further support of his contention that he was improperly denied a fitness hearing to which he was entitled under section 104—21(a), defendant declares in his brief that throughout his trial he was taking Dilantin to control epileptic seizures and that "[a]ccording to the record in another case before this Court, *People v. Kidd*, No. 76490, from time-to-time [*sic*], Tegretol (another anti-seizure medication) and Elavil (a tricyclic antidepressant), were also prescribed for him." In *Britz* this court construed the reference in section 104—21(a) to "psychotropic drugs or other medications" as being limited to psychotropic drugs or other like medications, with the result that a nonpsychotropic medication is insufficient to trigger the operation of the statute. *Britz*, 174 Ill. 2d at 196-97. In the unrelated case against this same defendant of *People v. Kidd*, 175 Ill. 2d 1, 18-19 (1996), which is the case to which he refers in his brief, we determined, in reliance upon *Britz*, that Dilantin is not a psychotropic drug for purposes of the fitness provision of section 104—21(a) with the result that defendant was not entitled to a fitness hearing under that section. That determination applies equally to defendant's claim here concerning his use of Dilantin during trial and is dispositive of it.

With respect to defendant's claims about his use of Tegretol and Elavil as shown by the record in *Kidd*, we stated there that defendant had "found references in various portions of the record in this case to his prior treatment with two other drugs: Tegretol, another epilepsy medication, and Elavil, an antidepressant" (*Kidd*, 175 Ill. 2d at 19). With regard to his use of Tegretol and Elavil in *Kidd*, we concluded that "there is no indication in the record that the defendant was actually receiving a psychotropic drug at any point near the time of trial or sentencing in this case. The references to his earlier treatment all predate, by substantial periods,

the beginning of the defendant's trial, in May 1993" (*Kidd*, 175 Ill. 2d at 20). We declined to adopt his argument there and, thus, to "order a remand for development of a further evidentiary record" concerning these two medications, as he had requested, because to do so "would mean that a remand must be available in every case in which the record contains some reference to the defendant's long-ago treatment with a psychotropic drug" (*Kidd*, 175 Ill. 2d at 20). In light of our disposition there and the fact that retrial in the instant case occurred well over a year after his trial in that case began in May of 1993, we find his contentions here concerning the use of Tegretol and Elavil singularly unpersuasive.

Defendant contends next that he did not knowingly and intelligently waive the right to assistance of counsel because he is "a brain-damaged and epileptic retarded man who depended on anti-seizure medication and who also received anti-depressants." Asserting that his "very condition prevented a knowing and intelligent waiver," he argues, *inter alia*, that he lacked "the requisite comprehension" to waive the right to counsel intelligently and knowingly; that in light of his "disabilities," the record demonstrates that he did not knowingly and intelligently waive the right to counsel; that his "mental deficiencies shape the totality of circumstances surrounding his purported waiver of rights"; that his "history of mental retardation, his brain damage, his epilepsy," all establish that, however willingly he waived counsel, he did not do so knowingly or intelligently; that the admonishments he received in no way cured or corrected his "underlying disabilities"; and that his waiver was unknowing because the admonishments were not given in a way suited to his "mental limitations." He cites examples of his conduct while representing himself that, in his view, support his claims concerning his disabilities and concomitant

failures of understanding and maintains that *People v. Lego*, 168 Ill. 2d 561 (1995), and *Godinez v. Moran*, 509 U.S. 389, 125 L. Ed. 2d 321, 113 S. Ct. 2680 (1993), govern this case and call for reversal.

As we said in *Lego*, although a court may deem a defendant's decision to represent himself unwise, if he makes his decision freely, knowingly, and intelligently, the court must accept it out of that respect for the individual which is the lifeblood of the law. *Lego*, 168 Ill. 2d at 564. Because an accused who manages his own defense relinquishes many of the traditional benefits associated with the right to the assistance of counsel, in order to represent himself the accused must knowingly and intelligently forgo those relinquished benefits. *Faretta v. California*, 422 U.S. 806, 835, 45 L. Ed. 2d 562, 581, 95 S. Ct. 2525, 2541 (1975); *Lego*, 168 Ill. 2d at 564. A waiver is, ordinarily, an intentional relinquishment or abandonment of a known right or privilege. *Johnson v. Zerbst*, 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023 (1938); *Lego*, 168 Ill. 2d at 564. When a defendant seeks to waive counsel, the trial court must not only determine that he is competent to stand trial but also satisfy itself that his waiver of this constitutional right is both knowing and voluntary. *Godinez*, 509 U.S. at 400, 125 L. Ed. 2d at 333, 113 S. Ct. at 2687. Although a defendant need not possess the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of such representation, so that the record will establish that " 'he knows what he is doing and his choice is made with eyes open.' " *Faretta*, 422 U.S. at 835, 45 L. Ed. 2d at 581-82, 95 S. Ct. at 2541, quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 87 L. Ed. 268, 275, 63 S. Ct. 236, 242 (1942); *Lego*, 168 Ill. 2d at 564-65. The requirement of knowing and intelligent choice calls

for nothing less than a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Patterson v. Illinois,* 487 U.S. 285, 292, 101 L. Ed. 2d 261, 272, 108 S. Ct. 2389, 2395 (1988); *Moran v. Burbine,* 475 U.S. 412, 421, 89 L. Ed. 2d 410, 421, 106 S. Ct. 1135, 1141 (1986); *Lego,* 168 Ill. 2d at 564-65. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances of that case, including the background, experience, and conduct of the accused. *Johnson,* 304 U.S. at 464, 82 L. Ed. at 1466, 58 S. Ct. at 1023; *Lego,* 168 Ill. 2d at 565.

The defendant's claims of brain damage and mental retardation appear to be based largely upon the testimony of Dr. Linda Wetzel, a neuropsychologist, whom defendant called to testify during the aggravation and mitigation stage of his sentencing hearing. Dr. Wetzel testified that in her practice she administers, interprets, and evaluates neuropsychological tests, which are tests of brain behavior and are primarily designed to measure any brain impairment. This witness gave defendant a battery of neuropsychological tests while he was in jail in May of 1993. Prior to testing defendant, Dr. Wetzel had in her possession an IQ test administered by Dr. Karen Smith as well as school records of IQ tests performed when defendant was approximately 7, 10, and 15 years old. Subsequent to the testing performed while defendant was in school, he was classified as educationally mentally handicapped. Dr. Wetzel did not repeat the IQ test that had recently been administered to defendant by Dr. Smith but did administer the wide range achievement test, which is a test measuring the grade level of reading, mathematics, and spelling, and the multilingual aphasia examination, which is a test designed to measure the expression and comprehension or understanding of the English language.

Dr. Wetzel testified that in 1993 Dr. Smith measured defendant's full scale IQ at 73 and that an IQ between 70 and 75 is documented as "at the high end of the mentally retarded range of intelligence." Dr. Wetzel stated that Dr. Smith classified defendant as "borderline mental retarded" and not mentally retarded; later Dr. Wetzel expressed her own opinion that defendant is "borderline mental retarded." Concerning the results of the tests that Dr. Wetzel had administered herself, the witness said that on the wide range achievement test she found defendant's reading and spelling ability at or below the third-grade level and his mathematics ability at the third-grade level. While she found his concentration "very poor," which made it difficult for him to learn or remember new information, she found his language fluent and grammatical, adding, "He's good at expressing himself." With respect to his comprehension of sentences, however, she found that if the sentences became too complex, a lot of repetition became necessary and the witness had to slow down, even in explaining how defendant was to complete some of the tests. For the witness, the need to repeat during testing indicated poor comprehension and, in his case, difficulty in concentrating. She also found his memory, visual motor ability, and capacity for abstraction to be impaired as well as his ability to learn "just a list of words" that she repeated to him several times.

Dr. Wetzel testified that she was aware of defendant's treatment with Dilantin, which she described as a common medication for a seizure disorder; such a disorder was, for her, "strong evidence of an impairment of the brain." She stated that she had learned from the defendant that as the result of a car accident at the age of 14 he had had a head injury involving a loss of consciousness. Defendant's scores on the neuropsychological tests fell within "an impaired range," she said, ranging from

mildly to severely impaired on all the tests she administered to him. Describing defendant as a man with considerable neuropsychological brain impairment, she expressed the opinion, based upon the results of her testing, that defendant has "impaired brain functions."

On cross-examination the witness testified that she had spent a total of approximately three hours with the defendant and that the neuropsychological tests she had administered to him require the cooperation of the person taking the test. Asked whether the person being tested could easily provide misleading information, Dr. Wetzel responded, "I think that there is [sic] certain patterns we expect to see, especially when we spend 2 or 3 hours administering tests, which oftentimes indicate when a person is not responding accurately and at his full level of cooperation." When she gives the wide range achievement test, she said, she gives the person being tested words to write out until he or she makes 10 consecutive errors, whereupon the test is stopped; in defendant's case he was able to write three words and then made 10 consecutive errors, whereupon she stopped the test, in accord with the standard administration of it. She testified that persons with epilepsy are usually able to function normally when they take Dilantin. She defined "malingering" as "faking on tests to make yourself look worse than you really are."

During this phase of the sentencing hearing, defendant called also as a witness Dr. George Savarese, a clinical social worker who had reviewed available records and had conducted interviews to prepare a psychosocial developmental evaluation of him. Among those Dr. Savarese had interviewed were Dr. Wetzel and Dr. Smith. Dr. Savarese testified that defendant had been diagnosed as being mentally retarded on three separate occasions, that is, at the ages of 7, 10, and 15, with scores of 63, 67, and 64, respectively, at those ages, scores that

were, he said, "[a]ll well within the mental retardation range." He stated further,

"For the issue of mental retardation, though, is not simply an issue of IQ that indicates that. There have to be other areas of social adaptation as it's referred to, ways to [*sic*] functioning and living in the community that also need to show some kind of impairment as well.

Specifically there were 3 key areas that it appears that Leonard had difficulties in terms of this functioning. With regard to the social deficits, skills and relating with other people appears to be markedly impaired. Tremendous tendency to act very impulsively in close interactions with other people. And particularly with problems with peers that he had at school was a lot of difficulty."

Dr. Savarese also noted that defendant had had problems with self-direction, which is another area of social functioning considered to be within the framework of understanding a diagnosis of mental retardation, as well as problems in the area of "home living," another area of social functioning, which pertains to the ability to function "within a home, in a neighborhood, in one's environment."

In rebuttal during this stage of the sentencing hearing, the State presented a stipulation between it and defendant that if Dr. Albert Stipes were called as a witness, he would testify that he is a licensed psychiatrist employed by the Psychiatric Institute of the circuit court of Cook County; he would be qualified as an expert in the field of forensic psychiatry; and he would testify that on December 9, 1985, pursuant to a court appointment, he had examined defendant and had concluded that the defendant was malingering.

Defendant bases his contention that he was unable to waive his right to the assistance of counsel knowingly and intelligently, in part, on facts that are disputed in the record. Whereas in *Lego* the testimony of the defendant's expert witnesses stood unrefuted, here evidence crucial to defendant's claim of mental impair-

ment is contradicted. Although Dr. Wetzel described an IQ such as defendant's as falling "at the high end of the mentally retarded range of intelligence" and expressed the opinions, primarily on the basis of defendant's performance on tests, that he suffered from impaired brain functions and is "borderline mental retarded," Dr. Stipes concluded that defendant was malingering, defined by Dr. Wetzel as "faking on tests to make yourself look worse than you really are." Moreover, although defendant relies, in part, on the fact that he was taking anticonvulsant medication to support his claim concerning waiver of the right to the assistance of counsel, Dr. Wetzel testified on cross-examination that persons with epilepsy taking the anticonvulsant Dilantin are usually able to function normally. With respect to defendant's further reliance in support of this claim on his having received "anti-depressants," we are mindful of the trial court's assessment of defendant as "totally mentally fit" during trial after the trial court heard defendant's testimony concerning his alleged use of drugs at trial, including the antidepressant Sinequan. While we are uncertain whether by "anti-depressants" defendant refers as well to the antidepressant Elavil, as he did in the prior issue presented for review, if such a claim is, indeed, intended in support of his contention of invalid waiver of his right to the assistance of counsel, we deem it meritless for the reasons already expressed in our consideration of the prior issue. Thus, on the basis of the record before us we are unable to say that the defendant's purported mental limitations and disabilities precluded his knowing and intelligent waiver of the right to the assistance of counsel.

Defendant contends that his waiver of the right to the assistance of counsel was invalid for the further reason that in admonishing him pursuant to Supreme Court Rule 401(a) (134 Ill. 2d R. 401(a)), the trial court

stated incorrectly both the charges and the minimum sentence upon conviction. Although one of the charges against the defendant was arson, the trial court admonished him that he was charged with aggravated arson.[1] Further, although the trial court admonished defendant that the minimum sentence was 20 years, defendant was convicted on May 19, 1993, of murdering four persons on January 12, 1984, with the result that these four prior murder convictions mandated a minimum term of natural life imprisonment in the instant unrelated case; an amendment to section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)), effective July 1, 1980, provided that for first degree murder "if the defendant has previously been convicted of murder under any state or federal law or is found guilty of murdering more than one victim, the court shall sentence the defendant to a term of natural life imprisonment." 730 ILCS Ann. 5/5—8—1, Historical & Statutory Notes, at 795 (Smith-Hurd 1992).

The record reveals that in court on August 23, 1994, the assistant public defender who was representing defendant following remand notified the court that defendant had informed him "after a recent jail visit that it's

---

[1]The defendant was originally charged by indictment with one count of arson, on which the jury rendered a verdict of guilty upon retrial, and two counts of aggravated arson, in addition to the multiple counts of first degree murder. Subsection (a)(1) of section 20—1.1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 20—1.1(a)(1)) was held to be unconstitutional in *People v. Johnson*, 114 Ill. 2d 69 (1986). Defendant was charged with one count of aggravated arson under that subsection. In *People v. Wick*, 107 Ill. 2d 62 (1985), subsection (a)(3) of section 20—1.1 (Ill. Rev. Stat. 1981, ch. 38, par. 20—1.1(a)(3)) was held to be unconstitutional. On September 15, 1987, prior to defendant's first trial in this cause, the trial court granted the motion of the State, made pursuant to the holdings in *Johnson* and *Wick*, for a *nolle prosequi* as to the two aggravated-arson counts.

his desire in this matter to go, pro se." Counsel indicated to the court that his relationship with defendant "goes back approximately 10 years" and that he had explained to defendant that "absolutely, he has a right to go pro se" but that it was "probably not in his best interest" to do so. After counsel said that defendant wished to address the court on the issue, the following colloquy between defendant and the trial court occurred:

"DEFENDANT KIDD: Yeah, I feel in my best interest to go, pro se.

THE COURT: Well, of course, I would disagree. I think you would be absolutely and totally foolish to undertake this trial without a good lawyer, an experienced lawyer in this case. A lawyer who has already fault [sic] one trial for you and knows the case and has always been extremely vigorous and energetic and conscientious in trying to defend you.

You know very well that you can receive the death penalty on this case. You were for 20 years in the Illinois Department of Corrections through natural life to the death penalty, and you would be called upon to make your own arguments, to make your own objections, gather your own legal written instructions at the end of the case, to introduce evidence.

You have, I think, a good idea from your trials, all that it takes to conduct a trial, to conduct a defense. And you would be called upon to do so.

DEFENDANT KIDD: Yeah.

THE COURT: Well—so, I really urge you not to try to undertake to defend yourself, but to stay with your lawyer.

DEFENDANT KIDD: It looks like that's my only way out. It's [sic] looks like my best way out, though.

THE COURT: Think about it again and see if you still have the same thought on September 7th, which is the trial date. It is going to go ahead on September 7th, whether you are your own lawyer or you wish Mr. Strunck [the assistant public defender] to keep defending you.

But particularly in this case, which is not a simple case, requires presentation of a good cross[-]examination,

involves the death penalty, which calls all kind [*sic*] of things that you know about since you went through this trial already.

I have real doubt whether you can do it yourself.

DEFENDANT KIDD: People sit right there on the stand and lied to you. I do it myself. I ain't going to go through what I did.

THE COURT: We'll see. You better rethink it. We'll see you September 7th."

Later that day, during a discussion of deadlines associated with the trial, defendant stated, "That's cutting it short. I'll do what I can." The trial court replied, "That's another problem one has when you know, you in custody, trying the defend [*sic*] yourself. But do the best you can." In turn, defendant responded, "But sometimes you have no choice, when people sit right there on the stand and lie, too."

Approximately a week later, after defendant indicated to the trial court that he wished still to proceed *pro se*, the trial court admonished him as follows:

"THE COURT: You have to understand that you are charged with—you're charged with first degree murder and, I believe, aggravated arson as well.

MS. LACY [Assistant State's Attorney]: I'm not sure if the aggravated arson was nolle'd. I believe it was nolle'd.

THE COURT: You're charged with ten counts of murder and a count of arson, aggravated arson, I believe. And I must tell you then the nature of those charges, which I think you already know since you went through a trial on them.

Secondly, you should know that on the murder charges, the minimum is 20 years, and the maximum is the death penalty. You understand that that's the minimum and the maximum. 20 years is the minimum; the death penalty is the maximum.
\*\*\*
You also must be informed, and I'm sure you already know, that you have a right to counsel, and if you are indigent without money, counsel, Mr. Strunck, the public defender, will be appointed for you."

Following the defendant's affirmative response to the trial court that he understood those admonitions, the trial court reiterated defendant's responsibilities in undertaking his own defense. Finally, the trial court asked defendant, "And knowing all those things, do you still wish to represent yourself," to which defendant responded, "Yeah." At this juncture the trial court stated that it wanted Strunck "here in the event that [defendant] changes his mind" and indicated for the record that Strunck was the standby counsel.

Rule 401(a) provides:

> "Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
>
>> (1) the nature of the charge;
>>
>> (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and
>>
>> (3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." 134 Ill. 2d R. 401(a).

Substantial compliance with Rule 401(a) is sufficient to effectuate a valid waiver of counsel if the record indicates the waiver was made knowingly and intelligently (*People v. Coleman*, 129 Ill. 2d 321, 333 (1989)) and the admonishment the defendant received did not prejudice his rights. *People v. Haynes*, 174 Ill. 2d 204, 236 (1996); *People v. Johnson*, 119 Ill. 2d 119, 132 (1987). Where a defendant knows the nature of the charges against him and understands that as a result of those charges he may be sentenced to death, his knowledge and understanding that he may be eligible to receive a lesser sentence pales in comparison. *Coleman*, 129 Ill. 2d at 334.

Here the record shows that the trial court complied substantially with Rule 401(a), informing defendant of the nature of the charges against him, explaining to him that the death penalty was the maximum sentence, and advising him of his right to counsel. Thus, we must determine next whether defendant's waiver of counsel was made knowingly and intelligently, despite the incorrect admonishment concerning one of the charges and the minimum sentence. See *Coleman*, 129 Ill. 2d at 334.

Defendant urges that the record "does not show that his waiver did not hinge on the area of non-compliance." We must disagree. The record indicates that defendant chose to waive his right to the assistance of counsel because of his expressed belief that in an earlier trial witnesses had lied, apparently without defense counsel's having exposed their lies. There is no suggestion in the record that the trial court's misstatement concerning either the charge of aggravated arson or the minimum sentence played any part whatever in defendant's waiver of his right to the assistance of counsel. Moreover, although the trial court did err in stating that one of the charges against defendant was aggravated arson, rather than arson, we fail to see how misinformation to the effect that defendant was charged with a crime more serious than that with which he was actually charged (see *People v. Johnson*, 114 Ill. 2d 69, 72 (1986)) could have affected adversely his decision to proceed *pro se*, particularly where he was also informed that he was charged with 10 counts of murder. Defendant was fully apprised that he could receive the sentence of death actually imposed and, thus, suffered no prejudice as a result of the trial court's failure to state correctly the minimum penalty to which he would be subjected if convicted. See *Johnson*, 119 Ill. 2d at 134. In spite of the trial court's incorrect admonishment concerning one of the charges against defendant and the minimum

sentence, the record here indicates that he waived counsel knowingly and intelligently.

Upon retrial the State marshalled an extensive array of evidence of defendant's guilt. Of the five apartments in the building that burned, three, all vacant, were located on the first floor, while two families lived in the two apartments on the second floor. In the second-floor apartment to the east, Brenda Boyd lived with her five children, four of whom died as a result of the fire; in the second-floor apartment to the west, Emma Burts lived with her four children, three of whom died in the fire. During the evening when the fire occurred, Emma's sister, Gertrude Armstrong, together with her five children, were in Emma's apartment while Emma worked as a nurse's aide and, according to Gertrude's testimony, Gertrude's 17-year-old daughter Diane baby-sat for Emma's children. Three of Gertrude's children, including Diane, perished in the fire. Eight of the children who died ranged in age from six months to nine years, while a ninth child was 13 years of age. One of Gertrude's daughters, Renee Armstrong, 14 years old at the time of the fire, was the girlfriend of defendant, who was visiting Renee at Emma's apartment on the evening of the fire. Defendant's father, Melvin Kidd, had owned the apartment building prior to his death and was a friend of Emma Burts' family.

Detective Ernest Rokosik, a police detective certified as an arson investigator, testified as an expert in the field of fire examination and cause and origin of fires. The witness arrived at the scene of the fire at 1512 East 65th Place in Chicago about 9 a.m. the morning after the fire. Evidence, including the absence of any fire damage at all beneath the first floor, indicated to the witness that the fire had not originated in the basement but had started on the first floor. In the front first-floor apartment there was primarily smoke damage and little

or no fire damage, facts indicating that the fire did not start there.

Detective Rokosik testified further that approximately four or five feet into the second of the three first-floor apartments, that is, the apartment to the east, there was a pile of clothing and miscellaneous papers and books on the floor that appeared to have had surface burning on them. There was no damage to the floor under the pile of burnt papers. The witness found no accidental or providential causes of that fire and concluded that an open flame had been applied to the combustible material on the floor. The type of fire the witness saw evidence of there would not have caused a great deal of smoke. Other areas of the room showed no path of communication from this point to the heavier fire damage in the center of the building, and the amount of fire damage in this apartment was "very minimal."

According to Detective Rokosik, the area of heaviest damage occurred in the third of the first-floor apartments, that is, the apartment at the rear to the west. He determined that there was a point of origin in a makeshift closet on the east wall of the large front room of that apartment. In the northwest corner of the room, the witness noticed what he believed to be a second point of origin of the fire, smaller than the main point of origin within the closet on the east wall where fire had burned longest and the largest fire had occurred. In the opinion of the witness, the fire originating in the closet was an intentionally set fire caused, as was the fire in the northwest corner of the room, by the ignition of an available combustible by open flame. Debris samples indicated that no flammable liquids had been applied. The fire damage indicated that the fire did not start in the kitchen area but in the closet and then communicated upwards, burning through the ceiling of the closet into the area between the ceiling of the first floor

and the floor of the second floor and, ultimately, through the roof. Detective Rokosik ruled out an accidental and providential cause of the fire in the building, expressing the opinion that to a reasonable degree of scientific certainty its cause was the intentional ignition of ordinary combustibles, that is, "[p]aper, rags, things of that nature," by some type of open flame, that is, "anything from cigarette lighter to a candle to a propane torch."

Renee Armstrong testified that at the time of the fire defendant had been her boyfriend for about three or four months. After defendant came to her aunt's apartment at about 7 or 8 p.m. on the evening in question, he told Renee that he smelled smoke. The witness smelled none. Upon saying that he smelled smoke, defendant said that he was going to go downstairs to see if any of the apartments there had anything burning. Then he, the witness, and her mother went downstairs to the first floor. Renee smelled no smoke when she arrived downstairs and saw no evidence of a fire. Defendant went to the apartment to the east and twisted the doorknob, but the door was locked, whereupon he kicked in the door. Defendant went to no other doors on the first floor before kicking in the door of the apartment to the east. The three went to the back of that apartment and found a dresser thrown over some books with "a small fire under it." Defendant started looking for something with which to put out the fire and found a foot tub and some pails that they filled with water and used to extinguish it.

After the fire was out, defendant said that he wanted to go over into the other apartment and see if anything was burning there. He told Renee and her mother to stay where they were and kicked a hole in the wall through which he entered the apartment on the west side. Renee lost sight of defendant for about three to five minutes. When he returned, he said that nothing

was burning there and found a blanket with which he covered the hole he had kicked in the wall.

Renee and defendant then went out to a McDonald's restaurant and were gone about 10 to 15 minutes. When they left the other children were asleep. When she and defendant returned to the apartment building, as they walked inside the hallway on the first floor, defendant said that he still smelled something burning. Renee smelled nothing and said so. She also told defendant, "I don't care what you're smelling. I'm going on upstairs and eating my food." She went upstairs alone, leaving defendant on the first floor. After she had begun to eat, defendant came upstairs and told her that he still smelled something burning. She still smelled nothing. When he told her mother that he smelled something burning, her mother got up. Renee heard then what seemed to be the sound of defendant kicking a hole in the bathroom and telling her mother that there was nothing burning. Then defendant and her mother went to the kitchen cabinets, which were on the west wall of her aunt's apartment and above the kitchen of the first-floor apartment on the west side. When defendant opened the cabinet, smoke came out. The three proceeded downstairs, whereupon defendant went toward the apartment on the west. The witness neither saw nor smelled smoke at that time. When defendant reached the door of that apartment, he told Renee to "tell Gert to get the kids out the building cause the building is on fire." Because her aunt had no telephone, Renee went to her own home nearby and called the fire department. When she returned, the first floor of the building was in flames.

Gertrude Armstrong's testimony corroborated that of Renee. Defendant, whom she had known for "[a] few years" through his father, arrived in the "late evening," asking whether she was cooking anything. When she

told him that she was not, he said that he smelled something burning. The witness said she smelled nothing burning. When she informed defendant that she was going to see his brother, defendant responded, "I don't think you should go. I feel something gone [sic] happen." Then defendant said that he was going next door to see whether Brenda was cooking anything, because he still smelled something, and went next door. Thereafter defendant awakened Renee and said that he smelled something burning and was going downstairs to check. With defendant leading, the three proceeded downstairs, where defendant kicked in the door of the first-floor apartment to the east. They entered to find "[a] lot of books like telephone books, newspapers and old dresser" burning in a small fire. After they had completely extinguished the fire in the manner Renee described, defendant told them to stay there and that he was going next door to check. He entered the apartment next door by knocking a hole in the wall and covered the entire hole with a blanket upon his return. The witness stayed where she was until he returned, as he had instructed her to do.

Gertrude Armstrong testified further that Renee returned to Emma's apartment alone after her 10- to 15-minute trip to McDonald's with defendant. About two to three minutes later, defendant returned to Emma's apartment saying that he smelled something burning. After knocking a hole in a wall of the bathroom, he went into the kitchen and opened the cabinet doors under the sink, from which smoke emanated. After defendant went downstairs to investigate, she heard him shout that she should call the fire department because the building was on fire. The witness ran to warn Brenda of the fire and then attempted to rescue her own and her sister's children. At about that time defendant returned to the second floor. He was burned in the fire

and, following his release from the hospital, lived with Gertrude for about six to eight months. Gertrude had known defendant since 1973 and prior to the fire had looked upon him rather like a son.

Brenda Boyd testified that she had lived on the second floor of the building for about a year at the time of the fire and thought that when she moved in Melvin Kidd owned the building. Once after she moved in and while Melvin Kidd was still alive, defendant had told her, in her words, that "he was gone [*sic*] be owning the building, that the father had given it to him." On the evening the fire occurred the witness returned home with all of her children at about 9 p.m. Shortly thereafter defendant, she thought, knocked on her door and said that the building was on fire, whereupon she sent two of her children downstairs to see about it. When the boys returned, they told her that the fire was out. Approximately 20 minutes later someone knocked on the door again, and Linda Burts, one of Gertrude's daughters, and some other children came rushing in, offering help in removing the children from the building.

Emma Burts testified that she had known defendant as a friend of his family and had known his sister and his father. She had paid her rent most often to Melvin Kidd and had seen defendant with him around the building. However, after Melvin Kidd died in 1979, she said, she paid her rent to Deborah Kidd, who had told Emma to give it to no one but her. Early in 1980 Emma had had a conversation with defendant concerning the ownership of the building; she testified that defendant "thought the building was his." After Melvin Kidd's death, defendant came to the apartment building in question almost daily.

Emma Burts testified further that before the fire she thought that she and defendant were "friends." The day after the fire she saw defendant at the hospital and

"asked him did he do it," by which question, she said, she was asking whether he had set the fire because defendant had told her months before the fire that "his father taught him to set fires without hurting anybody." Early in 1980, after defendant's father had died, the witness had a conversation with defendant in which he had said, in her words, "Told me soon this building gone [*sic*] pay off." He made this remark after the "City" had posted a notice on the door, which notice Emma saw defendant remove in October, a few weeks before the fire occurred. Approximately a week after the fire, while defendant was staying at Gertrude's, Emma asked him again "did he do it"; defendant answered by saying, in Emma's words, "if he tell me what he know can I protect him" and walked away. About two weeks after the fire, at a benefit for the families of the children who died in it, Emma asked defendant again "did he do it"; defendant answered, "If I told you who I know will you protect me" and walked away.

During Emma Burts' cross-examination the State stipulated that a certain document is a certified copy of a warranty deed to the property commonly known as 1512 East 65th Place, dated February 7, 1980, from Melvin Kidd and Carrie Ruth Kidd as grantors to "Deborah Rene Kidc [*sic*] and Beverly Ann Kidd, sisters both single."

James Linn testified that on September 14, 1984, while he was an assistant State's Attorney, he advised defendant of his *Miranda* rights and defendant told him that he understood them. In the presence of three police detectives, defendant proceeded orally to answer questions posed by the witness about the fire nearly four years earlier. Although initially defendant gave an exculpatory account of the events of that evening, after one of the police officers, namely, Sergeant Murphy, showed him photographs of some of the bodies of the

victims of the fire, defendant trembled and swallowed and his breathing became very labored. After putting his head on his hands, he looked up at the witness and said, "[O]kay, okay. I don't want to run from this anymore. I was involved. I did start the fire." When the witness asked him why he had started the fire, defendant responded, "I have a lot of reasons. I want to get this off my chest. I want to explain. I don't want to run from this anymore." The witness stated further, "He said there was a problem with my father, meaning his father. There was something about his father that that was one of the reasons that he started the fire. And he said this is very important you understand. He say [sic] I want to tell you everything." However, defendant indicated that he wanted to talk first with his mother and his grandmother because he wanted them to hear this information initially from him rather than the television or newspaper. Defendant indicated that after he spoke with his mother and grandmother he would provide the witness with "all details and fill you in with everything."

After the witness attempted to locate defendant's mother and grandmother, he returned to the room in which defendant was sitting with Sergeant Murphy, who stated to defendant, "Leonard, why don't you tell them what you just told me?" Defendant agreed to do so and said, "I'm looking at these pictures. You don't have the picture that shows the exact location where I started the fire." When the witness asked defendant what he meant, defendant "pointed, took one of [sic] pictures which is a picture of the building, the burned out frame of the building. He said you don't have it here. The place where I started the fire was in a closet." Defendant pointed to a window in the picture and indicated that the closet was near it. When the witness asked defendant what he used to start the fire, defendant told him

"there was old clothing, scraps of things, that's what he ignited to start the fire with." Again defendant told those present "that the reason he did it concerned a very personal matter involving his father. That he wanted to talk to his mother and grandmother personally to explain it to them first. And then he would go on and tell [those present] more about it after that." The witness added, "As I recall there was something about his father had died and there was problem about who inherited some real estate that his father owned that had caused him a great deal of anguish." The witness made further attempts to reach defendant's mother and grandmother. Although defendant's mother arrived later at the State's Attorney's office, defendant did not avail himself of the opportunity to speak with her and declined to talk further to the witness.

Defendant called as a witness his mother, Clara Kidd, who testified that she and Melvin Kidd had owned the building in question but that after she and Melvin had separated, she did not know what happened to the building except that Beverly Kidd owned it. To her knowledge there was no insurance on the building. She indicated that Melvin Kidd had given defendant a different building at another location but that it had "burned up" while defendant was in jail.

As defendant's third contention of error, he maintains that his first degree murder convictions must be reversed because they are based on void counts of felony murder that the grand jury predicated on the unconstitutional offense of aggravated arson. The grand jury charged defendant by indictment with felony murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(3)) in the deaths of each of the 10 victims, the predicate forcible felony of which was aggravated arson. On September 15, 1987, prior to defendant's first trial in this cause, the trial court allowed the State's motion, over defendant's objec-

tion, to amend each charge of felony murder by interlineation, striking the word "aggravated" in each charge so that the predicate forcible felony became arson. Defendant contends that this amendment was impermissible. The grand jury also charged defendant with first degree murder as to each of the 10 victims pursuant to both of the other two subsections of section 9—1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(a)(1), (a)(2)), that is, subsection (1), under which defendant could be convicted if the jury found that he intended to kill or do great bodily harm to the victim or another or knew that his actions would cause the death of the victim or another, and subsection (2), under which defendant could be convicted if the jury found that he knew that his acts created a strong probability of death or great bodily harm to the victim or another. Defendant was retried upon the original indictment as amended. The jury, upon retrial, returned 10 general verdicts in which it found him guilty of murder.

At the sentencing phase upon retrial, the State alleged the existence of two statutory aggravating factors as bases for his eligibility for a sentence of death, namely, that the defendant has been convicted of murdering two or more individuals (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)) and that the murdered persons were killed in the course of another felony, specifically arson, if the murdered persons were actually killed by the defendant and in performing the acts which caused the death of the murdered persons, the defendant acted with the intent to kill the murdered persons or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered persons or another (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)). The jury found defendant eligible for a death sentence solely upon the statutory aggravating factor of defendant's having been convicted of murdering two or more individuals.

Defendant asserts that "[a]t death-eligibility, immediately after the guilt verdicts, it became clear that the jury had returned murder convictions solely on the charges asserting felony-murder" under section 9—1(a)(3). He reasons that the jury's having "declined to find death-eligibility based on felony-murder with intent to kill or with knowledge of the strong probability of death or great bodily harm" on the heels of rendering its verdict of guilty "showed that the jury did not unanimously conclude that [defendant] intentionally and knowingly caused the deaths," pursuant to section 9—1(a)(1), and "also showed that the jury did not unanimously conclude that he caused death knowing that there was a strong probability of death or great bodily harm," pursuant to section 9—1(a)(2). "By not finding Leonard Kidd death-eligible on felony-murder grounds," defendant avers, "the eligibility verdicts reflected a mental state that was legally inconsistent with any possible finding that Leonard Kidd guilty [sic] of murder on Sections 9—1—A—(1) and (2)."

During its deliberations concerning defendant's eligibility for a death sentence, the jury sent a note to the court inquiring whether the jurors could decide eligibility on the basis of only one statutory aggravating factor or whether the jurors were required to be in agreement as to both such factors. In the note the jurors asked whether the form pertaining to a finding of eligibility on the basis of the statutory aggravating factor having to do with the murdered individual's having been killed in the course of another felony "base[s] the eligibility on the arson conviction alone, or both felony convictions." The jurors stated further in the note, "There is some confusion with the language, and whether the idea of 'intent' is critical with the arson conviction." The note concluded with the question, "Do we need to sign both eligibility forms?" In a written re-

sponse made over the defendant's objection, the trial court instructed the jury, "You may sign only one eligibility verdict form." The jury did so, leaving the other eligibility verdict form unsigned. Defendant argues in his reply brief that "the jury note makes it clear that the impetus to return only one verdict came from the jury itself."

A general finding of guilty is presumed to be based on any good count in the indictment to which the proof is applicable. *People v. Cardona*, 158 Ill. 2d 403, 411 (1994). In Illinois it is well established that where an indictment contains several counts arising out of a single transaction and a general verdict is returned, as occurred here, the effect is that the defendant is guilty as charged in each count to which the proof is applicable. See *Cardona*, 158 Ill. 2d at 411; *People v. Scott*, 148 Ill. 2d 479, 555 (1992). There is in this record abundant applicable proof that defendant knew, at the very least, that his acts created a strong probability of death or great bodily harm to those who died. Thus, defendant is guilty as charged in each of the counts of knowing murder as to the 10 victims.

We can ascribe no significance to the jury's failure to sign the other eligibility verdict form beyond the fact that, in response to the jury's question whether it needed to sign both eligibility verdict forms, the trial court had informed the jury that it could sign only one. Although not all aspects of the note from the jury are clear, the jury's question whether it needs to sign both eligibility forms is unambiguous and the trial court's answer clear. The jury plainly acted in accord with the trial court's response to its question. Since the jury indicated to the trial court that there was "some confusion with the language" of the other form and the trial court then informed the jurors that they need sign but one of the two eligibility verdict forms, it is not surpris-

ing that the jurors did not sign the form about which they had expressed confusion. To reason from the jury's failure to sign the other eligibility verdict form its intention effectively to acquit defendant of knowing murder is unwarranted on the basis of this record, and we consider no further the third issue defendant presents. Accordingly, we make no determination concerning the propriety of the trial court's granting of the State's motion to amend by interlineation the original indictments charging felony murder.

In another issue defendant raises for review, he contends that when the police and assistant State's Attorney interrogated him about the instant offenses while he was in custody and represented by counsel concerning the unrelated case to which we have previously referred, his counsel in the unrelated matter was attempting to see him, first, by going to the jail where defendant was incarcerated and then, upon being informed that defendant had been taken to the office of the State's Attorney, by going there. At the time of the interrogation in question defendant had not been charged with any of the instant offenses. Defendant states that at the office of the State's Attorney, his attorney in the unrelated matter, that is, Paul Stralka, attempted to contact the assistants trying the unrelated case but was told that they were in conference and could not be disturbed. He states further that when Paul Stralka asked the receptionist whether defendant was in the office, she told him that she had "no information" and that no one informed defendant that his attorney was trying to see him while he was being questioned. He maintains that the confession obtained in consequence of that interrogation should be suppressed and the conviction reversed on the authority of *People v. McCauley,* 163 Ill. 2d 414 (1994), in which this court determined that under our state constitution due process is violated when po-

lice interfere with a suspect's right to his attorney's assistance and presence by affirmatively preventing the suspect, exposed to interrogation, from receiving the immediately available assistance of an attorney hired or appointed to represent him. However, the record is insufficient to support defendant's claim since it does not show that defense counsel attempted to see defendant before he made the inculpatory statements about which James Linn testified. Thus, we address this issue no further.

In still another issue defendant advances on review, he contends that he should receive a new trial because of two errors that "prejudiced his right to present a defense" and another error that "curtailed his right to confront and cross-examine State witnesses." Defendant cites as one of the asserted errors prejudicing his right to present a defense the trial court's refusal to allow him to call Paul Stralka as a witness in his own behalf. In attempting to call this witness, defendant explained to the trial court his reason for doing so:

> "For the purpose that he can witness and verify that when he come to the jail to see me on an unrelated matter, he was notified that I was at the assistant state's attorney office on the 14th floor which is right next door to this building, and that he was indeed in fact trying to get in to see me or be with me during this interview, and he was denied that."

Following further argument by the parties, the trial court denied the defendant's request to call this witness, reasoning:

> "I know a defendant can show the circumstances under which a statement was made, but I think this Stralka's testimony would be collateral and apart from the circumstances under which the defendant allegedly made his statement.
>
> It's obvious from what has just been said that Mr. Stralka did not witness any part of the statement. It's also obvious from what the defendant has said that the

defendant did not know Stralka was there. So it could not have any effect on Kidd's state of mind as he either made a statement or did not make a statement to police and an assistant state's attorney.

Stralka witnessed nothing of the alleged statement, and so, therefore, whether Stralka was or was not at a receptionist desk somewhere in the state's attorney's office I don't think has any bearing or any indirect bearing as to whether the defendant made a statement, whether the statement was made voluntarily or not, and finally as to whether or not, as the defendant has indicated, he never did make a statement. Stralka simply is not a witness to any of this."

Defendant asserts that by denying him the opportunity to call Paul Stralka as a witness, the trial court denied him the opportunity to contest the evidentiary weight of the confession attributed to him. Had the jury been made aware of the circumstances under which his confession was made, he argues, the jury could have inferred that these conditions undermined the reliability and credibility of the testimony of James Linn about the defendant's admissions to him. We note with respect to the circumstances under which defendant's confession was made that following defendant's first trial he claimed unsuccessfully in this court that his oral confession had been obtained in violation of his fifth amendment right to counsel. That fact aside, however, in light of the overwhelming evidence of defendant's guilt adduced at trial, even if we assume that the trial court erred in refusing to allow defendant to call Stralka as a witness, we are compelled to conclude that the State has proved beyond a reasonable doubt this refusal did not contribute to the jury's verdict and such error was, at most, harmless. See *Satterwhite v. Texas*, 486 U.S. 249, 256, 100 L. Ed. 2d 284, 293, 108 S. Ct. 1792, 1797 (1988).

With respect to this same issue, defendant contends that the trial court's refusal to allow him to call Renee

Armstrong as a defense witness, concerning a relatively minor evidentiary matter, prejudiced his right to present a defense and that the trial court's limitation of his cross-examination of Detective Rokosik curtailed his right to cross-examine that witness. Defendant sought to cross-examine Detective Rokosik concerning reports by persons other than the witness himself, but the trial court limited his cross-examination in this regard to those reports that the witness himself had signed or authorized, advising defendant that he could not try to contradict the witness by someone else's report and that he must call or question the author of the report or someone with personal knowledge of it. Having read the entire record on appeal and considered the defendant's assertions concerning these two claims, we have determined that they are without merit. Once again, in view of the overwhelming evidence of defendant's guilt, the State has proved beyond a reasonable doubt that neither of these two errors—assuming that they are, indeed, error—contributed to the jury's verdict, with the result that any such error was harmless. See *Satterwhite*, 486 U.S. at 256, 100 L. Ed. 2d at 293, 108 S. Ct. at 1797.

Likewise without merit is defendant's contention, in a separate issue raised for review, that prosecutorial misconduct during opening statement and closing argument warrants reversal of the judgment and remand for a new trial. He identifies several instances of such misconduct, none of which, should they be found to be error, could, alone or in combination, have been more than harmless in light of the extent of the evidence of defendant's guilt.

Raised for the first time on review as plain error in this, his second, appeal is defendant's contention that his confession, given prior to the first trial, should be suppressed for two reasons, namely, because his "mental

disabilities meant that it was not made pursuant to a knowing and intelligent waiver of rights" and because it resulted from a conflict of interest on the part of one of his former attorneys in the unrelated case, Earl Washington, who represented him before Paul Stralka did so. With respect to the first of these two reasons, he argues that when Assistant State's Attorney Linn informed him of his *Miranda* rights and questioned him and when Sergeant Murphy questioned him, defendant "labored under the combined debilitating effects of mental retardation, organic brain damage, and epilepsy, and he was taking at least one prescribed medication (either Dilantin or Tegretol) to control his seizures, and he may have been taking at least one prescribed antidepressant—either Elavil or Sinequan." For the same reasons that we are unable to say, on the basis of the record before us, defendant's purported mental limitations and disabilities precluded his knowing and intelligent waiver of the right to the assistance of counsel, we are unable to say that they precluded his knowing and intelligent waiver of his fifth amendment rights.

With regard to the latter of the two reasons defendant advances for the suppression of his confession, as we stated in our disposition following defendant's first trial (*Kidd*, 147 Ill. 2d at 527), for approximately two or three months after defendant's arrest on January 12, 1984, on the unrelated charges (see *People v. Kidd*, 129 Ill. 2d 432 (1989)), private attorney Earl Washington represented both defendant and his half brother Leroy Orange as codefendants. In the unrelated case, in which defendant was charged with murder, armed robbery, aggravated arson, and concealment of homicidal deaths, the bodies of three adults and a child were found on January 12, 1984, bound and gagged, the victims having been stabbed repeatedly; two separate fires had been set inside the apartment. See *Kidd*, 175 Ill. 2d at 13. Leroy

Orange was also arrested on January 12, 1984. *People v. Orange*, 121 Ill. 2d 364, 369 (1988). On April 19, 1984, Earl Washington withdrew from his representation of defendant because of a conflict of interest, and Assistant Public Defenders Stralka and Stopka were appointed to represent him. Earl Washington continued to represent Leroy Orange. The causes of the two codefendants were severed at an early stage in the proceedings. *Kidd*, 175 Ill. 2d at 13. After Earl Washington withdrew from his representation of defendant, Leroy Orange indicated to Washington that he believed defendant had been involved in the fire in the instant case, whereupon Washington approached someone in the State's Attorney's office and related this information, thereby prompting the State's Attorney's office to interrogate defendant. *Kidd*, 147 Ill. 2d at 527.

At the hearing on defendant's motion to suppress his custodial statements, conducted on August 5, 1986, prior to his first trial, Earl Washington testified that during his representation of defendant in the unrelated matter he was unaware of the offenses in the instant case and that the only matter he had discussed with defendant during his representation of him "related to a quadruple homicide and arson." Earl Washington explained that he could not continue to represent both defendant and his half brother because "Mr. Kidd informed me and also Mr. Orange and the Court that he was desirous of becoming a witness for Mr. Orange's defense, and that he was prepared to admit that he committed the murder and arson in connection with that case [that is, the quadruple homicide] before Judge Cieslik." Stating that defendant subsequently testified on behalf of Leroy Orange, Earl Washington testified further,

> "[W]hile we were in court, Mr. Orange informed me of his belief that Mr. Kidd had been involved in this particular arson [that occurred on October 28, 1980] and requested

that I inform the state's attorney of that fact to buttress his theory that Mr. Kidd also committed arson involving a quadruple homicide, and I spoke to Mr. Kaplan, Mr. Richard Kaplan [an assistant State's Attorney at the time] on this very same day about that homicide or about that arson. I didn't know any of the particulars other than what Mr. Orange had informed me."

On redirect examination the witness said that he had learned of the defendant's possible involvement in the offenses that occurred on October 28, 1980, originally from Leroy Orange; that during the entire time he had represented defendant between January and April of 1984 neither defendant nor Leroy Orange had broached the subject of the offenses committed on October 28, 1980; that he and defendant had discussed only the case of quadruple homicide that was pending; and that when he had spoken to Kaplan he was acting upon the specific request of Leroy Orange.

Defendant contends that his custodial statements introduced at trial through the testimony of Assistant State's Attorney Linn are directly traceable to Earl Washington's conflict of interest, so that the use of those statements against him violated both federal and state guarantees of due process and his right to the effective assistance of counsel. He argues that the "conflict that Washington created by informing against Leonard Kidd and by destroying his defense in [the case of quadruple homicide] extends into this case" and that Earl Washington's "betrayal" triggered the interrogation during which defendant made the statements he seeks to suppress.

He maintains that Washington engaged in conduct prohibited by Rule 1.9(a) of the Rules of Professional Conduct (134 Ill. 2d R. 1.9(a)), which provides,

"A lawyer who has formerly represented a client in a matter shall not thereafter:

(1) represent another person in the same or a substantially related matter in which that per-

son's interests are materially adverse to the interests of the former client, unless the former client consents after disclosure; or

(2) use information relating to the representation to the disadvantage of the former client, unless:

(A) such use is permitted by Rule 1.6; or

(B) the information has become generally known."

Rule 1.6(a) of the Rules of Professional Conduct (134 Ill. 2d R. 1.6(a)) provides that, except under certain circumstances, "a lawyer shall not, during or after termination of the professional relationship with the client, use or reveal a confidence or secret of the client known to the lawyer unless the client consents after disclosure."

During the course of Washington's simultaneous representation of both Kidd and Orange, a conflict of interest developed that led him to withdraw from the representation of Kidd. Washington acquired no information about the instant offenses from Kidd and in disclosing information about them to the State's Attorney's office could, therefore, have breached none of Kidd's confidences. He had long since ceased to represent Kidd when his remaining client, Leroy Orange, provided the information about the instant offenses to him and asked that he reveal it to the State's Attorney. At no time did Earl Washington represent defendant in the instant case, which is essentially unrelated to the one of quadruple murder in which he had been defending Kidd and continued to represent Orange. Thus, there is no validity to defendant's claim that his confession in the instant case arose out of a conflict of interest on the part of his former counsel, Earl Washington, in the quadruple murder case.

Also raised for the first time on review as plain error is the defendant's contention that Detective Rokosik's testimony and all evidence introduced through him should have been suppressed pursuant to *Michigan v.*

*Clifford*, 464 U.S. 287, 78 L. Ed. 2d 477, 104 S. Ct. 641 (1984), and *Michigan v. Tyler*, 436 U.S. 499, 56 L. Ed. 2d 486, 98 S. Ct. 1942 (1978), because it was obtained as a result of Detective Rokosik's warrantless entries. The State responds, *inter alia*, that defendant lacks standing to raise this claim.

A fourth amendment violation can be urged successfully only by those whose rights have actually been violated by the search itself, not by those who have been aggrieved solely by the introduction of damaging evidence. *People v. Keller*, 93 Ill. 2d 432, 439 (1982). Capacity to claim fourth amendment protection depends, not upon a property right, but upon whether·the aggrieved person has a legitimate expectation of privacy in the place invaded. *Rakas v. Illinois*, 439 U.S. 128, 143, 58 L. Ed. 2d 387, 401, 99 S. Ct. 421, 430 (1978); see *People v. Bolden*, 152 Ill. App. 3d 631, 635 (1987). A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable. *Minnesota v. Olson*, 495 U.S. 91, 95-96, 109 L. Ed. 2d 85, 92, 110 S. Ct. 1684, 1687 (1990). Whether one has a legitimate expectation of privacy in a place is measured by an objective standard drawn from common experience. *Bolden*, 152 Ill. App. 3d at 635. Property ownership, while it is not dispositive, is a factor to be considered in determining whether an individual has standing to test the constitutionality of a search and seizure. *People v. Johnson*, 114 Ill. 2d 170, 191 (1986), citing *United States v. Salvucci*, 448 U.S. 83, 91, 65 L. Ed. 2d 619, 628, 100 S. Ct. 2547, 2553 (1980). Other factors relevant in determining the existence of a reasonable expectation of privacy include whether the defendant was legitimately present in the area searched; whether the defendant had a possessory interest in the area or the property seized; whether the defendant had previously used the area searched or the area seized; whether the defendant had the ability to

control the property or to exclude others from using it; and whether the defendant had a subjective expectation of privacy in the property. *Johnson,* 114 Ill. 2d at 191-92. The question whether a defendant has a reasonable expectation of privacy in the area searched or in the items seized must be answered in light of the totality of the circumstances of the particular case. *Johnson,* 114 Ill. 2d at 192.

This record provides evidence of not even a single factor indicative of a reasonable expectation of privacy by defendant in either the place searched or any property seized. On the evening the fire occurred, many hours before the search took place, defendant was for a short time a guest of his 14-year-old girlfriend of some months and her mother in an apartment not their own. Defendant appears not to have been present during the search of the burned premises the next morning. He did not own the property searched and seems to have had at the time in question neither a possessory interest in it nor the ability either to control the property or to exclude others from using it. Under the totality of circumstances in the present case, defendant had no reasonable expectation of privacy in the area searched or in any property taken from it. Hence, he lacks the capacity to claim fourth amendment protection and may not urge a fourth amendment violation with respect to Detective Rokosik's warrantless search of the building after the fire.

Defendant presents a number of issues arising out of the sentencing stage of his trial. With respect to his contention that multiple errors at the eligibility phase of his sentencing hearing require reversal of the jury's verdict finding him eligible for the imposition of a death penalty, he claims, *inter alia,* that the jury's finding of eligibility, pursuant to section 9—1(b)(3), providing for the statutory aggravating factor of multiple murder,

violated his fifth amendment guarantee against double jeopardy because his eligibility was based solely on his convictions in the unrelated case in which he was found guilty of the first degree murder of four persons and was sentenced to death. He reasons that the use of these convictions to establish his eligibility for death in the instant case has resulted in the imposition of multiple punishments for the same offense, from which the fifth amendment guarantee against double jeopardy affords protection (*North Carolina v. Pearce*, 395 U.S. 711, 717, 23 L. Ed. 2d 656, 664-65, 89 S. Ct. 2072, 2076 (1969)).

However, section 9—1(b)(3) neither creates a new or independent criminal offense nor increases the punishment for the previously committed offense. *People v. Franklin*, 135 Ill. 2d 78, 107 (1990). That section merely

> "dictates when an individual, who has been found guilty of murder under section 9—1(a), may be eligible to receive the death penalty as a result of a previous murder conviction. The punishment is for the new crime, not the prior crime, and the penalty is enhanced only because the individual was found guilty of more than one murder." *Franklin*, 135 Ill. 2d at 107.

In *People v. Edgeston*, 157 Ill. 2d 201, 228 (1993), the defendant claimed that his fifth amendment guarantee against double jeopardy had been violated because the State had been allowed to relitigate his mental state in a prior murder case in order to prove his eligibility for the death penalty in the subsequent one at bar. We found the argument in *Edgeston* without merit and determined that the State's use of the prior murder conviction to establish his death eligibility under section 9—(b)(3) did not increase the punishment the defendant had received in the prior case but, rather, enhanced the penalty he was eligible to receive in the subsequent one. Likewise, in the instant case, the use of the four prior murder convictions to establish defendant's eligibility for the imposition of a death sentence under

section 9—1(b)(3) resulted in no further punishment for the four prior murder convictions. The punishment that has been imposed as a consequence of using these convictions for eligibility is the punishment for the subsequent, instant crime. Therefore, defendant's argument that he has been punished a second time for the four previous murder convictions by virtue of their having been used to establish his eligibility for the death penalty in this case is not well taken.

Among the errors put forth by defendant as having occurred at the eligibility phase of his sentencing hearing is a violation of due process occasioned by the failure to admonish him of his right to elect the statute under which he would be sentenced. He was found eligible for the imposition of a death sentence pursuant to the version of section 9—1(b)(3) in effect at the time the offenses occurred in 1980, providing that a defendant may be sentenced to death if

> "the defendant has been convicted of murdering two or more individuals under subsection (a) of this Section or under any law of the United States or of any state which is substantially similar to Subsection (a) of this Section regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts." Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3).

He maintains that when he was sentenced in 1994, he should have been permitted to elect to be sentenced under the version of section 9—1(b)(3) in effect at that time and that under the terms of that version of the statute, he was not eligible for the imposition of a death sentence. At the time of his sentencing in 1994, this section provided that a defendant may be sentenced to death if

> "the defendant has been convicted of murdering two or more individuals under subsection (a) of this Section or under any law of the United States or of any state which

is substantially similar to subsection (a) of this Section regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate acts which the defendant knew would cause death or create a strong probability of death or great bodily harm to the murdered individual or another." 720 ILCS 5/9—1(b)(3) (West 1994).

Arguing that the prior statute required proof of only separate premeditated acts without the intent to kill or knowledge of the likelihood of death, defendant relies upon his position, advanced with respect to the third issue presented for review, that the jurors could not conclude unanimously that he was eligible for the imposition of a sentence of death on the basis of his having committed felony murder "because they doubted that he intended to cause the deaths resulting in this case and doubted that he knew there was a strong probability of death or great bodily harm." Thus, he concludes, had the jury been instructed according to the version of section 9—1(b)(3) in effect when he was sentenced, the jury would have found him ineligible because the deaths were not the "result of either an intent to kill more than one person or of separate acts which the defendant knew would cause death or create a strong probability of death or great bodily harm." However, we have already determined that there is abundant proof in the record that defendant knew that his acts created a strong probability of death or great bodily harm to those who died. Consequently, there is no merit to his contention that he would have been ineligible for the imposition of a death penalty had he been sentenced under the version of section 9—1(b)(3) in effect in 1994. He suffered no prejudice as a result of any failure to admonish him of his right to elect to be sentenced under that version of the statute and no violation of his right to due process in this regard.

We have examined all of defendant's other contentions of error with respect to the eligibility phase of his sentencing hearing as well as his numerous claims of error concerning the aggravation and mitigation phase of his sentencing hearing and conclude that they are not meritorious.

The final issue defendant presents for our review consists of eight constitutional challenges to the Illinois death penalty statute, each of which this court has previously considered and rejected. Defendant articulates no persuasive reasons why we should reconsider our decisions concerning any of these challenges, and we decline to do so.

Therefore, for the reasons stated above, we affirm the judgment of the circuit court of Cook County. We hereby direct the clerk of this court to enter an order setting Wednesday, January 14, 1998, as the date on which the sentence of death entered by the circuit court of Cook County is to be carried out. The defendant shall be executed in a manner provided by law (725 ILCS 5/119—5 (West 1994)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*