# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Harris*, 2013 IL App (1st) 111351

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICARDO HARRIS, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-1351 |
| Filed | October 16, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The dismissal of defendant's postconviction petition was affirmed following the rejection of his contentions that the State violated its duty to disclose evidence that a witness recanted her initial identification of defendant, that his trial counsel was ineffective, that his waiver of counsel during pretrial proceedings was not knowing, and that there was a *bona fide* doubt of his fitness to stand trial. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 99-CR-18554; the Hon. Colleen McSweeney-Moore, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Brian E. Koch, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Christine Cook, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion. Justices Quinn and Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a jury trial, defendant Ricardo Harris was convicted of two counts of murder, one count of attempted murder and one count of aggravated battery with a firearm. Harris was sentenced to death on the murder counts, and to consecutive terms of 30 years each on the remaining counts. The Illinois Supreme Court affirmed Harris's convictions and sentence on direct appeal. *People v. Harris*, 225 Ill. 2d 1 (2007). Harris's death sentence was subsequently commuted to natural life.

¶ 2    Harris, assisted by counsel, filed a postconviction petition. The circuit court granted the State's motion to dismiss the petition. On appeal, Harris contends that the circuit court erred in dismissing the petition because he made a substantial showing that (1) the State violated its constitutional duty to disclose exculpatory evidence, (2) he received ineffective assistance of trial counsel, and (3) his waiver of the right to counsel during a significant portion of pretrial proceedings was not knowing, he was not competent to represent himself, and there was a *bona fide* doubt regarding his fitness to stand trial. For the reasons that follow, we affirm the judgment of the circuit court of Cook County.

¶ 3                                    BACKGROUND

¶ 4    On May 13, 1999, at approximately 7:25 p.m., the Oak Lawn police department received a report of a shooting at the Extra Value liquor store in Oak Lawn, Illinois. Police officers responding to the call discovered that four persons had been shot, store employees Dipak and Ambalal Patel and customers Christina and Helen Chisnick. The victims were transported to the hospital, where Dipak and Ambalal died from their wounds.

¶ 5    Christina and Helen went to the liquor store around 7:15 p.m. Christina parked her van in the parking spot to the right of the store entrance. There were no other cars in the parking lot and only Dipak and Ambalal were inside the store.

¶ 6    Christina and Helen walked down the aisle with the beer coolers and Ambalal walked over to assist them while Dipak remained behind the counter. Christina took a case of beer

from the cooler and turned to see Dipak walking toward them and a man with a gun behind him. The man shot Dipak, then shot Ambalal and Christina. Helen heard a gunshot and saw Ambalal's chest turn bloody, then saw Christina fall to the floor. Helen turned and saw the gunman, who was standing about five feet away. Helen looked at the gunman's face for several seconds. He then shot her.

¶ 7 Helen pretended to be dead for about 20 seconds and then went to the front of the store. She saw a man and a woman, neither of whom had been in the store when she and Christina arrived. She asked the woman to call 911 and the police and paramedics arrived shortly thereafter.

¶ 8 Christina, who was shot twice, communicated briefly with an officer in the emergency room before undergoing surgery. She told the officer that the gunman was a black male, approximately 5 feet 9 inches with short, natural, black hair. A detective also interviewed Helen in the emergency room while she was being treated for a single gunshot wound to the abdomen. Helen told the detective that the offender was a black male, approximately 5 feet 11 inches and 170 pounds, and he was wearing a black shirt or jacket, black pants, and black shoes. The next day, the detective interviewed Helen at length and, with her assistance, prepared a composite sketch of the gunman.

¶ 9 In the meantime, detectives interviewed other witnesses at the scene. Jesse Lee, Jr., went to the liquor store shortly before the shootings. Inside the store, he saw a black male and a Hispanic male. When Lee left the store, he saw two other vehicles in the parking lot. A Hispanic woman and a child were in one vehicle, and a black male was sitting in the driver's seat of the other vehicle.

¶ 10 Lee drove to a gas station down the street and had been there for about 10 minutes when he heard the sirens and saw the police vehicles at the liquor store. He returned to the store, told police about the three men he had seen, and assisted the police in preparing composite sketches of the men.

¶ 11 Larry Lozano and Heather Doran both went to the liquor store shortly after the shootings occurred and before police and paramedics arrived. Lozano told detectives that one of the male victims told him the offenders were two black males. Doran told police she saw two men running on Cicero Avenue before she pulled into a gas station to buy cigarettes. Five minutes later, Doran drove to the liquor store and went inside, where one of the female victims told her that four people had been shot by two black men and asked her to call 911.

¶ 12 On May 15, after reading about the liquor store incident in the newspaper, Frank Sarelli contacted the police and informed them he had information about the shootings. Sarelli told the police he was living at the Aloha Motel, five blocks from the Extra Value liquor store. Sarelli met Harris at the motel on May 11 and smoked some crack cocaine with him. Harris then gave Sarelli money to procure more drugs. Sarelli obtained drugs for Harris three separate times at Harris's request on May 11 and 12.

¶ 13 After Sarelli delivered drugs to Harris for the third time, Harris told Sarelli he had a gun he wanted to sell. Harris showed Sarelli a black, .40-caliber Glock handgun. Sarelli made calls to several drug dealers he knew but was unable to sell the gun.

¶ 14 Harris came to Sarelli's room the morning of May 13 and asked for more cocaine. He

also told Sarelli that he was no longer interested in selling the gun because his brother and cousin were coming into town from Michigan and they might want the gun. In a recording of the initial call Sarelli made to police, he described the gun as "a Glock 40 caliber semiautomatic pistol, 13 shot clip." At the time Sarelli first contacted police, there was no reward posted for information relating to the shootings.[1]

¶ 15    On the basis of the information provided by Sarelli and from information obtained from the Aloha Motel, police were able to obtain a picture of Harris from authorities in Michigan, where Harris had escaped from police custody six days before the shootings. On May 15, 1999, detectives visited Helen and showed her a photo array that included the picture of Harris they had obtained. Helen selected Harris's photo and identified him as the person who shot her.

¶ 16    Also on May 15, Jean Janeway contacted the police and told them she and her husband had gone to the liquor store shortly after the shootings. Her husband, Melville, parked the car to the right of a van that was in the parking lot. The van obscured Janeway's view of the store entrance. Janeway stayed in the passenger seat of the car while her husband went inside the store. Melville remained in the store for two to three minutes. While she waited in the car, Janeway saw a man walking on the sidewalk in front of the store. Janeway did not see him until he walked past the front of the van. The man stopped and appeared surprised to see her, then walked between her car and the van.

¶ 17    Approximately one minute later, Janeway's husband ran back to the car and told Janeway about the victims he found inside the store. Her husband said he did not see anyone else in the store. Although she did not say anything to police that evening about the man she had seen, two days later Janeway told the police that she recognized the composite sketch that had been broadcast on television the night before as the man she had seen outside the store that day. Janeway subsequently selected Harris's photo from a photo array.

¶ 18    On May 16, detectives traveled to Flint, Michigan, to interview Harris's brother, Roderick, whose name was on the Aloha Motel registration card and who was initially a suspect in the case. On May 23, a detective visited Christina in the hospital, where she was still recovering, and showed her the same photo array that had been shown to Helen, except that a picture of Harris's brother had been substituted for one of the other photos. Christina selected Harris's photograph from the array as the person who shot her. Prior to identifying Harris in the photo array, Christina had not seen any news coverage of the incident and she had not seen Harris's photo on broadcast television or in the newspaper.

¶ 19    On August 4, 1999, Harris was arrested in Charlotte, North Carolina. He had a North Carolina identification card containing his photo and the name Joaquinn Alexander McCall, and a social security card with the same name. Harris was extradited to Illinois, where the Oak Lawn police conducted a physical lineup on August 7. Christina and Helen viewed the lineup separately. In both viewings, each subject in the lineup walked up to a two-way mirror. Christina and Helen both asked for Harris to approach the mirror a second time. Both

---

[1]By the time of trial, Sarelli testified that he expected to receive a reward of $2000 to $2500 if Harris was convicted.

of them identified Harris. Sarelli and Janeway also viewed the lineup separately and both identified Harris.

¶ 20    Harris was initially represented by an attorney with the public defender's office. During a hearing on May 4, 2000, Harris requested the appointment of different counsel because he felt that his appointed counsel "did not want to respect" any of the things Harris thought would be helpful to his case and because Harris wanted a speedy trial. Harris further explained that he felt his appointed counsel was prejudiced against him because of his criminal history. The trial court commented that if it was a matter of a personality conflict, Harris could try to work that out with the public defender's office, but stated that Harris's only other options were to retain private counsel or represent himself. The trial court advised Harris to reconsider his request for different counsel and expressed confidence in the abilities and experience of Harris's appointed counsel. Harris proceeded with his initial counsel for more than a year after that hearing.

¶ 21    On August 14, 2001, Harris again asked for the appointment of different counsel, stating that he had no trust in his counsel and that he believed his counsel was working against him. Harris's primary contention was that he believed he had been arraigned before he was formally indicted, based on his understanding of different time stamps that appeared on copies of documents he had received. The trial court assured Harris that he had been indicted by the grand jury on August 12, 1999, and subsequently arraigned on August 16.

¶ 22    Harris reminded the court that he and his counsel were at odds from the beginning, because Harris wanted a speedy trial so that the State would not have time to build a case against him, but his counsel told him that no attorney "worth his salt" would take a client to a speedy trial given the magnitude of the charges facing him. Harris stated that if the court would not appoint new counsel, he would be forced to represent himself because he did not trust his current counsel. The trial court admonished Harris that if he chose to represent himself, he would do so at his peril and would be at a tremendous disadvantage. The trial court gave Harris a few weeks to consider his decision.

¶ 23    At the next status hearing, Harris told the trial court he had decided not to represent himself because he had limited access to the law library and a very limited supply of law books. The trial court admonished Harris that it was not going to allow him to vacillate regarding whether to continue with appointed counsel and asked if Harris's decision was final. Harris said that it was and that he and the two attorneys from the public defender's office had spoken prior to the hearing and they were trying to resolve the trust issue.

¶ 24    A few months later, however, Harris again told the trial court that he wanted to discharge his attorneys and represent himself because he did not trust either of them. Harris also requested the appointment of counsel other than from the public defender's office due to a conflict of interest. After considering Harris's complaints, the trial court observed that the issue was really a disagreement over tactics or strategy, not a conflict of interest. The trial court declined to appoint new counsel and agreed to reconsider Harris's motion to represent himself.

¶ 25    The trial court allowed Harris to argue facts in support of his allegation that counsel had not acted in his best interest. Defense counsel explained to the trial court that Harris was

initially cooperative until he began to believe there was a conspiracy against him that included defense counsel and the public defender's office and that every attempt to demonstrate to Harris that his fears were unfounded had failed. The trial court considered Harris's motion to represent himself together with another lengthy motion Harris had prepared asking for the appointment of a law professor as his counsel. In denying both motions, the trial court found that (1) the allegations raised were either spurious or pertained only to trial tactics or strategy, (2) defense counsel had been zealous in his representation of Harris, (3) Harris was attempting to create a conflict of interest by conjecture and meritless complaints, (4) no actual conflict had been shown, and (5) Harris would not be prejudiced if defense counsel continued to represent him. Harris then elected to proceed *pro se*, but stated that he thought it was unfair and that he was only making that decision because the court refused to appoint alternative counsel.

¶ 26 With respect to Harris's professed desire to represent himself, the trial court admonished him, both verbally and in writing, regarding the nature of the charges, the possible penalties, and the risks and requirements of self-representation. The trial court also gave Harris additional time to consider his decision.

¶ 27 At the next hearing, Harris repeated his intention to proceed *pro se* and the trial court read the admonishments again. Harris executed the waiver of counsel in open court. As a final precaution, the trial court ordered a behavioral clinical examination (BCX) regarding Harris's fitness to stand trial and his competency to make the decision to represent himself.

¶ 28 Dr. Roni Seltzberg from Forensic Clinical Services conducted the BCX, which took months to complete. In connection with reaching her opinion regarding Harris's fitness to stand trial and his ability to decide to represent himself, Dr. Seltzberg reviewed voluminous documents, including medical records that reflected a history of substance abuse and head injuries and failed to disclose a psychiatric history, transcripts of proceedings before the trial court, and motions filed by Harris, including a lengthy handwritten document detailing his complaints against his appointed counsel. Dr. Seltzberg also interviewed Harris. The trial court granted two continuances to allow Dr. Seltzberg to complete her report.

¶ 29 In her report, Dr. Seltzberg expressed her opinion that Harris was both fit to stand trial and competent to decide to represent himself. Dr. Seltzberg was further of the opinion that Harris had a very good understanding of the nature of the charges and proceedings against him, had the capacity to assist counsel in his defense, and his choice to represent himself did not appear to be based on any psychotic process or cognitive disorder but, rather, on his own interpretation of other matters unrelated to a psychiatric disturbance. The trial court then accepted Harris's waiver of counsel.

¶ 30 Harris thereafter filed numerous *pro se* motions, participated in hearings on those motions, conducted the depositions of five witnesses and requested and received the appointment of several expert witnesses. Among others, Harris deposed Helen and Christina, both of whom testified unequivocally that he was the person who shot them as well as Dipak and Ambalal. Harris also deposed Janeway, who identified him as the person she saw in the parking lot the night of the shootings.

¶ 31 After Harris was permitted to proceed *pro se*, the trial court periodically questioned him

as to whether he wished to continue to represent himself. Harris always responded affirmatively.

¶ 32    As the trial date approached, the trial court decided to appoint private counsel for the limited purpose of addressing again Harris's claim that he had received ineffective assistance from his prior counsel. Harris's appointed attorneys elected to stand on the previous motion and did not present any supporting evidence. Harris's attorneys informed the court that, following discussions with Harris regarding his right to testify in support of the allegations in his motion, Harris stated that he did not wish to exercise that right. The motion was again denied and private counsel was dismissed.

¶ 33    A few months later, Harris told the trial court he would like to reconsider his decision to proceed *pro se* because he realized he was not able to effectively represent himself. The trial court later appointed the same private counsel to represent Harris at trial. Over the next 10 months, Harris's counsel reviewed all of the discovery, filed numerous motions, worked diligently on mitigation, obtained the appointment of a second investigator, was present at the deposition of Dr. Otto MacLin, the only defense expert, litigated and won a motion to suppress, and successfully litigated a motion to exclude two of Harris's three prior convictions.

¶ 34    Harris refused to cooperate with his appointed counsel in developing mitigation evidence in preparation for the sentencing phase of his trial. Although defense counsel repeatedly pursued family members and others for information relating to mitigation, Harris expressed his desire to the trial court that no mitigation evidence be presented.[2]

¶ 35    Harris's trial commenced on January, 30, 2004. The State called a firearms expert who testified that the three bullets recovered during the investigation were .40-caliber, jacketed, Hydrashock hollow-point bullets, a distinctive type of ammunition manufactured only by the Federal Company. The bullets recovered from the store and from Ambalal's body were fired from the same gun, and the five cartridge cases recovered from the store could also have been fired from the same gun. Each cartridge had distinct elliptical firing pin impressions that are only left by the firing pin of a .40-caliber handgun manufactured by the Glock Company.

¶ 36    Pauline Zelko, an officer with the Genesee County sheriff's department in Flint, Michigan, testified that Harris was in her custody on May 7, 1999. At approximately 8 a.m. that day, Harris disarmed Zelko, took her firearm, and escaped. Zelko's firearm was a .40-caliber semiautomatic Glock handgun, loaded with .40-caliber, jacketed, Federal Hydrashock hollow-point ammunition.

¶ 37    Helen testified that she gave the police a description of the gunman and helped the police produce a composite sketch without speaking to Christina and without viewing any prior composite sketches or photographs of other suspects. As noted, she identified Harris from

---

[2]In Harris's direct appeal, the supreme court observed that despite Harris's wishes, his counsel had obtained various medical records. Addressing Harris's claim that his attorneys were ineffective for failing to present this evidence in mitigation despite his contrary direction, the court found counsel's decision not to use the records to be reasonable because, among other things, they did not disclose that Harris suffered from any neurological disorder. *Harris*, 225 Ill. 2d at 48.

a photo array two days after the incident and before Harris's photo was broadcast on television and in newspapers. Helen acknowledged that she later saw Harris's photo on television twice prior to the physical lineup in August 1999.

¶ 38    Helen explained that she told the detective she was "70% sure" when she selected Harris's photo in May because "[i]t wasn't a picture that shot me. It was a real person that shot me." She wanted to see Harris in person to be 100% sure that he was the gunman. When she saw Harris in the lineup in August, Helen knew he was the person who shot her, but asked to have him step forward again so that he would know she had identified him.

¶ 39    Christina testified that at the time she viewed the photo array in May 1999, she had not seen any television or print news coverage because of her medical condition. In particular, Christina had not seen Harris's photo before viewing the photo array. Prior to the physical lineup in August, Christina had seen Harris's photograph twice on television programs. During the lineup, Christina asked if Harris could approach the mirror again and walk from left to right. She explained that she made that request because that was how Harris walked in the liquor store and it was the only thing she could do to make Harris aware that she knew he was the one who shot her. Christina then told the officer that Harris was the gunman.

¶ 40    Christina was asked about a statement she made when she selected Harris from the photo array that her selection was based on his hair and the shape of his head. She explained that was part of it, and also the shape of his eyes which she described as round rather than almond-shaped, and his ears. Christina testified that she was certain of her identification of Harris as the person who shot her.

¶ 41    Although Janeway was listed as a witness for the State, she did not testify at trial. Lozano and Doran, who entered the liquor store shortly after the shootings, also did not testify. Lee testified and his testimony was consistent with the account he gave police on May 13, 1999, regarding people he saw in the store prior to the shootings.

¶ 42    Dr. Otto MacLin testified as a defense expert in eyewitness identification. MacLin, an assistant professor at the University of Northern Iowa, holds advanced degrees in psychology. Prior to trial, MacLin prepared a report containing 18 opinions relating to the fallibility of eyewitness identification, including, among others, the concept of "weapons focus," *i.e.*, that when a person is threatened with a gun, the person's attention is drawn to the weapon and not the face of the person holding it, thus making later identification less reliable; the difficulty inherent in eyewitness identification of offenders of a different race; and the effect that images of a suspect shown on broadcast media have on later identifications by eyewitnesses. Over the State's objection, the trial court ultimately granted defense counsel's request that MacLin be permitted to testify regarding cross-racial identifications and weapons focus. Defense counsel did not pursue tendering MacLin as an expert on the effect of media coverage on eyewitness identification.

¶ 43    Following his convictions, which, as noted, were affirmed on direct appeal, Harris filed, with the assistance of counsel, a postconviction petition on April 1, 2008, that raised 10 issues. Attached to the petition were medical records, police reports, and numerous affidavits, including those of Janeway, Doran, MacLin, Dr. Robert Hanlon, a neuropsychologist, and Matthew McQuaid, one of Harris's trial attorneys. Harris

subsequently amended the petition to include two issues challenging his death sentence. The circuit court granted the State's motion to dismiss on July 23, 2010. While Harris's motion to reconsider was pending, his death sentence was commuted to natural life. On April 15, 2011, the circuit court denied Harris's motion to reconsider. Harris timely filed this appeal.

¶ 44                                                  ANALYSIS

¶ 45     On appeal, Harris contends that the circuit court erred in dismissing his petition because he made a substantial showing that the State violated its constitutional duty to disclose exculpatory evidence by not informing the defense that Janeway recanted her identification of Harris. Additionally, Harris contends that he made a substantial showing that his trial attorneys were ineffective for failing to present (1) exculpatory evidence, including that Janeway lied when she initially identified Harris and that two of the victims told bystanders that two men committed the shootings, and (2) expert testimony regarding the effect of postevent information on the reliability of eyewitness identification, and for failing to request a fitness hearing. Finally, Harris contends that he made a substantial showing that his waiver of the right to counsel was not knowing and intelligent, that he was not competent to represent himself, and that there was a *bona fide* doubt regarding his fitness to stand trial, which should have been explored by the trial court at a fitness hearing.

¶ 46     The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2008)) provides a procedural mechanism by which any person imprisoned in the penitentiary may assert that there was a substantial denial of a federal or state constitutional right in the proceeding that resulted in his or her conviction. 725 ILCS 5/122-1(a) (West 2008); *People v. Harris*, 224 Ill. 2d 115, 124 (2007). Postconviction proceedings may consist of up to three stages. *People v. Pendleton*, 223 Ill. 2d 458, 471-72 (2006). At the first stage, the circuit court, without any input from the State, may dismiss a petition that is frivolous and patently without merit. *Harris*, 224 Ill. 2d at 126. A petition must present "the gist of a constitutional claim" to survive beyond the first stage. *Id.* At stage two, the circuit court may appoint counsel for the defendant and the State may move to dismiss the petition. *Id.* At the second stage, the relevant inquiry is whether the petition sets forth facts that, if true, make a substantial showing of a constitutional violation. *Id.* A petition that is not dismissed at the second stage proceeds to the third stage where the circuit court conducts an evidentiary hearing. *Id.*

¶ 47     At both the second and third stages of postconviction proceedings, the defendant bears the burden of making a substantial showing of a constitutional violation. *Pendleton*, 223 Ill. 2d at 473. At the second stage of the proceedings, all well-pleaded facts not positively rebutted by the trial record are taken as true. *Id.* The circuit court does not engage in fact-finding or credibility determinations at the second stage; rather, such determinations are made at the evidentiary stage. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). Here, the circuit court granted the State's motion to dismiss Harris's postconviction petition. The decision to grant a second-stage motion to dismiss is a matter of law and subject to *de novo* review. *Id.* at 387-88; *Pendleton*, 223 Ill. 2d at 473.

## I. The Claimed *Brady* Violation

¶ 49    Harris first contends that he made a substantial showing that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose that Janeway recanted her identification of Harris as the person she saw in the parking lot after the shootings. In an affidavit attached to the postconviction petition, Janeway attests that after she testified in a deposition that Harris was the person she had seen outside the liquor store on the day of the shootings, she continued to meet with prosecutors. On one such occasion prior to trial, she told a female assistant State's Attorney whose name she could not recall that she lied at her deposition and that Harris was not the man she had seen outside the store.

¶ 50    It is well settled that "the prosecution must disclose evidence that is favorable to the accused and material either to guilt or to punishment." (Internal quotation marks omitted.) *People v. Harris*, 206 Ill. 2d 293, 311 (2002) (quoting *Brady*, 373 U.S. at 87). The standard for materiality under *Brady* is whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.* Under this standard, a reviewing court does not consider the sufficiency of the evidence, but rather whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (Internal quotation marks omitted.) *Id.* at 311-12 (quoting *People v. Coleman*, 183 Ill. 2d 366, 393 (1998)).

¶ 51    In *Kyles v. Whitley*, cited by Harris, the Supreme Court commented that "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995) (citing *United States v. Bagley*, 473 U.S. 667, 675 (1985)). *Kyles* recognizes that prosecutors have both the discretion to determine whether disclosure is required and the responsibility "to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached." *Kyles*, 514 U.S. at 437.

¶ 52    At the outset, it should be noted that the premise of Harris's *Brady* argument is his contention that the State's case against him at trial was "weak" and thus the State's failure to disclose Janeway's recantation takes on greater significance. That characterization is not borne out by the record.

¶ 53    The State's evidence at trial tied Harris to the crime through the testimony of two eyewitnesses and uncontroverted proof that, from May 7 through May 12, Harris was in possession of the distinctive type of weapon and unique ammunition used on the night of the murders. In particular, Helen and Christina–two eyewitnesses/victims–identified Harris as the shooter shortly after the incident and never wavered from that position.[3] The State also

---

[3]To the extent Harris claims that Helen and Christina were "tentative" in their identifications because (1) Helen said she was "70% sure" that Harris was the shooter after viewing the photo array, but wanted to see him in person, (2) Christina allegedly told a police officer she did not get a good look at the shooter's face (a statement she denied making), and (3) both Helen and Christina asked that Harris approach the two-way mirror twice when they identified him in the lineup, Harris was able to fully explore these issues through cross-examination of Helen and Christina and the testimony of other witnesses at trial. The State's failure to disclose Janeway's recantation thus had

traced possession of a .40-caliber Glock, the type of weapon used in the incident, and its sole-source ammunition to Harris. Michigan police officer Zelko testified that six days before the shooting, Harris was in her custody. He disarmed her and escaped. Harris took Zelko's .40-caliber semiautomatic Glock handgun loaded with .40-caliber, jacketed Federal Hydrashock hollow-point ammunition. Firearms expert Jeffrey Parise testified that three bullets recovered from the victims and the scene were .40-caliber, jacketed Federal Hydrashock, hollow-point bullets. A bullet recovered from Ambalal's body and another found on the floor of the store were fired from one gun to the exclusion of all others. The fired cartridge cases recovered from the store had markings that could only have been made by the firing pin of a .40-caliber handgun manufactured by the Glock Company. Sarelli testified that two days before the shootings Harris asked his help in selling a .40-caliber Glock handgun, which Harris showed to Sarelli. Harris was living at the Aloha Motel, five blocks from the scene of the shootings. In the face of the foregoing evidence, the fact that the weapon was not recovered does not translate into a finding that Harris was convicted on the basis of "weak" evidence. Consequently, in light of the strength of the State's case against him, Harris faces an uphill battle to demonstrate that the sole instance of non-disclosure raised in his petition rises to the level of a *Brady* violation.

¶ 54    Taking the nondisclosure of Janeway's recantation as true, this evidence is neither material nor exculpatory. First, Janeway was not an eyewitness to the shootings. She and her husband arrived at the liquor store after the shootings. Janeway was sitting in the passenger seat of a car outside the liquor store and her view of the store entrance was obscured by Christina's cargo van.[4] After her husband went inside the store and had been in the store for two minutes or so, she saw a man walking on the sidewalk in front of the store, but she did not see him until he walked in front of the van and he then proceeded to walk through the parking lot between the van and her car. It was not until Janeway saw the composite on television that she contacted the police and told them the man in the composite was the man she had seen in front of the store.

¶ 55    Melville Janeway, Lozano, and Doran, who each entered the store shortly after the shootings, told police they did not see anyone leaving the store. Thus, the likelihood that the person on the sidewalk was the shooter was remote, at best. There was therefore no reason

---

no effect on this aspect of Harris's defense.

[4]Janeway's affidavit submitted with Harris's postconviction petition clearly overstates her deposition testimony: "At that deposition, I said that Ricardo Harris was *the man I saw come out of the liquor store* and in the liquor store parking lot." (Emphasis added.) In her deposition, Janeway does not say anything about seeing a man exit the store. The next sentence of the affidavit, however, states only that Janeway was not telling the truth when she identified Harris "*as the man I saw in the liquor store parking lot*." (Emphasis added.) This second sentence is entirely consistent with the police report in which she indicated that she could not see the store's entrance from the car because her view was blocked by Helen and Christina's van. Harris's effort to use the misstatement in the first sentence to argue that Janeway must have seen someone other than Harris come out of the store is thus factually unsupported.

to believe the man Janeway had seen was connected with the shootings until Janeway later claimed that Harris, the person who had already been identified by Helen as the gunman, was the man she had seen that day. As Harris's trial counsel noted at a pretrial hearing, Janeway's original account placing Harris at the scene at least several minutes after the shootings and after others had arrived on the scene was improbable.

¶ 56    Second, Janeway did not testify at trial. The jury never heard that someone who arrived at the store after the shootings identified Harris as being at the scene. Instead, the jury found Harris guilty on the basis of the identification made by the surviving victims and the circumstantial evidence that placed Harris in the vicinity of the liquor store prior to the shootings and connected Harris to a weapon of the same make and caliber and with the same unique ammunition as the weapon used in the crime. Therefore, Janeway's initial identification neither played a role in Harris's conviction nor is it reasonably probable that her recantation, had it been disclosed, would have produced a different result at trial. Her testimony either way was simply not material.

¶ 57    Finally, Janeway's recantation was not exculpatory or even "favorable" to Harris. If no witness placed Harris in the parking lot several minutes after the shootings, it would not make it less likely that he was, in fact, the shooter.

¶ 58    In a different vein, Harris contends that Janeway's initial identification of him after the composite and his photo were broadcast on television and in newspapers and her later admission that the person she saw was not, in fact, Harris, would have bolstered the defense theory that eyewitness identifications following media displays of a suspect's likeness are inherently unreliable. While Janeway's about-face may theoretically illustrate one of MacLin's opinions (which defense counsel elected not to pursue at trial),[5] its relevance is exceedingly marginal in the context of a case where two victims identified Harris from a photo array without any exposure to media coverage. Thus, while Janeway's recantation may have tended to show that *she* was susceptible to being influenced by images of Harris she saw in the media, it would have had absolutely no bearing on the validity of Helen's and Christina's identifications.

¶ 59    Harris's attempt to bolster his *Brady* violation claim by analogizing the State's failure to disclose Janeway's recantation to the failure to disclose an informant's statements in *Kyles* is without merit. Virtually the only similarity between Janeway and the informant in *Kyles* is that neither testified at trial. The informant whose statements were never disclosed in *Kyles* was "essential" to the State's investigation and he " 'made the case' " against the defendant. *Kyles*, 514 U.S. at 445. Here, Janeway's statement was disclosed to defense counsel and given the fact that she was not an eyewitness to the shootings, her testimony was clearly not essential to the State's case.

¶ 60    Moreover, in this case, the prosecution's failure to disclose Janeway's recantation is the only claimed *Brady* violation. In contrast, the prosecution in *Kyles* failed to disclose contemporaneous eyewitness statements containing inconsistent descriptions of the offender,

---

[5]For the reasons discussed *infra* ¶¶ 65-66, this tactical decision does not give rise to an ineffective assistance claim.

numerous (and manifestly contradictory) statements given by the informant (some of which tended to implicate the informant in the murder), information tending to show defendant's vehicle was not parked in the lot where the murder occurred, and evidence linking the informant to other crimes at the scene. The Supreme Court found that the cumulative effect of the suppression of this evidence undermined confidence in the verdict. *Id.* at 453.

¶ 61    The same cannot be said in this case. The fact that Janeway recanted her identification of Harris as the person she saw outside the store after the shootings does not "put the whole case in such a different light as to undermine confidence in the verdict." Thus, we conclude that Harris has not made a substantial showing of a *Brady* violation.

¶ 62                    II. Harris's Ineffective Assistance Claim

¶ 63    Next, Harris contends that he has made a substantial showing that his trial attorneys were ineffective for failing to (1) adequately investigate or present at trial Janeway's statement to a prosecutor that she lied when she identified Harris, and statements that would have supported the theory that two men other than Harris shot the victims, and (2) present testimony from MacLin concerning the effect of postevent publicity on the reliability of eyewitness identification.

¶ 64    Ineffective assistance of counsel claims are measured against the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687-88, 694; see also *People v. Edwards*, 195 Ill. 2d 142, 162-63 (2001). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Because a defendant must establish both prongs for a successful ineffective assistance claim, a court considering such a claim need not determine the reasonableness of counsel's performance before considering whether defendant suffered prejudice as a result of the alleged deficiency. *Id.* at 697; *Edwards*, 195 Ill. 2d at 163.

¶ 65    With respect to counsel's failure to investigate and present evidence regarding Janeway's faulty identification, as previously discussed, Janeway's admission the person she saw outside the store several minutes after the shootings was not Harris is not exculpatory evidence, nor is it evidence that someone other than Harris committed the shootings. There is nothing in Janeway's affidavit to suggest that the individual she saw was the gunman.

¶ 66    Indeed, contrary to the affidavit submitted by McQuaid in support of Harris's postconviction petition in which he attests that had he known Janeway recanted he would have called her as a witness at trial, McQuaid's co-counsel expressed the opposite opinion regarding the value of Janeway's identification of Harris at a pretrial hearing. Co-counsel stated (with McQuaid present): "[O]ur position is it [Janeway's testimony] is completely inconsistent with what the two surviving victims describe, that five minutes later Ricardo Harris was standing outside the liquor store milling around." Given trial counsel's understandable skepticism regarding Janeway's identification of Harris, if counsel had learned of Janeway's recantation prior to trial, she would have become irrelevant as a witness

to both the State and the defense. Thus, Harris has not met the prejudice prong under *Strickland* and, as a result, he has not made a substantial showing that counsel was ineffective for failing to further investigate Janeway's statements.[6]

¶ 67    Harris also argues that his trial attorneys were ineffective for failing to pursue evidence that two shooters were involved in the crime. In particular, Harris points to evidence that Doran and Lozano, who arrived at the store shortly after the shootings, were told by separate victims that the shooters were "two black men." According to police reports, Doran told police that one of the female victims came to the front of the store, told her that multiple people had been shot by two men and asked her to call 911. Lozano also told police that one of the male victims told him that two individuals were responsible for the shootings.

¶ 68    As a threshold issue, accepting as true these witness statements, they do not exclude the possibility that Harris was one of the shooters. Consequently, the introduction of victim statements that two shooters were involved would not have helped Harris given the other evidence that tied him to the crime regardless of whether or not he acted alone.

¶ 69    Moreover, Harris's postconviction petition does not raise a substantial issue on this point. Helen is the only victim who walked to the front of the store after she had been shot, and Helen testified that she told Doran only that multiple people had been shot and asked her to call 911. Doran's affidavit attached to Harris's postconviction petition states that she cannot remember Helen saying anything other than that they had been shot and asking her to call 911. Thus, given that Doran's affidavit does not support the two-shooter theory, it follows that counsel cannot be deemed ineffective for failing to present her testimony.

¶ 70    With respect to Lozano's statement to the police, the record reflects that Harris's appointed attorneys requested and received a delayed trial date so that they could locate and interview Lozano, in the hopes that his testimony could support the two shooter theory. There is nothing in the record to indicate the result of that interview, but the defense did not, in fact, call Lozano as a witness. Harris has not attached an affidavit from Lozano to the petition. Consequently, because Harris has not even established what Lozano's testimony would have been, Harris has failed to demonstrate that his counsel were ineffective for not presenting Lozano's testimony at trial.

¶ 71    Harris also argues that trial counsel should have presented Doran's statement to police that she saw two men running away from the direction of the liquor store five minutes before she arrived at the store. Again, accepting Doran's statement to the police as true, it does not discount the possibility that Harris was one of those men.

¶ 72    Further, Harris's arguments regarding the relevance of Doran's statement are internally inconsistent. In his ineffective assistance argument, Doran's statement supposedly supports the two-shooter theory. However, in connection with his *Brady* argument, Harris contends that Doran must have entered the store almost immediately after the shootings because Helen

---

[6]Harris also does not articulate what would have prompted his trial counsel to "further investigate" Janeway given the consistency of her pretrial identifications of Harris. Taking the nondisclosure of her recantation as true, there would have been no reason for defense counsel to take steps to obtain any additional information from Janeway.

testified that she encountered Doran within a minute after she was shot. Thus, under this iteration of Harris's argument, Doran's statement regarding the two men she saw running in the opposite direction five minutes earlier is obviously irrelevant because she would have seen them even before the shootings occurred.[7]

¶ 73    Harris further contends that his trial attorneys were ineffective for failing to present expert testimony about how postevent publicity can lead to misidentification. In the context of this case involving two eyewitnesses who identified Harris prior to seeing any pictures of him in the media, this argument is specious. Moreover, the only photo of Harris that Helen and Christina saw on television prior to the physical lineup in August was the one they had already picked out of the photo array in May. It is, therefore, impossible that their exposure to this photo could have produced an unreliable identification. Because MacLin's opinion regarding the possibility that postevent publicity can produce unreliable identifications was absolutely irrelevant, counsel cannot be deemed ineffective for failing to present it.

¶ 74        III. Harris's Decision to Proceed *Pro Se* and His Fitness to Stand Trial

¶ 75    Finally, Harris contends that he made a substantial showing that his waiver of the right to counsel was not knowing and intelligent, that he was not competent to represent himself, and that there was a *bona fide* doubt regarding his fitness to stand trial. With regard to the fitness claim, Harris argues that the trial court erred by not ordering a fitness hearing or, alternatively, that trial counsel was ineffective for not requesting a fitness hearing.

¶ 76    It is necessary to place Harris's arguments on these issues in context. For over two years following his arraignment in August 1999, Harris was represented by attorneys from the Public Defender's office. At Harris's request and after the extensive proceedings detailed above, Harris was allowed to waive counsel and he represented himself from October 2001 until March 18, 2003, when, again at his request, counsel were appointed to represent him at trial. Trial commenced 10 months later in January 2004.

¶ 77    Although Harris argues that several significant pretrial steps were taken during his period of self-representation, including the depositions of witnesses (conducted in open court in the presence of the trial judge) and the appointment of an expert, he does not claim that there were any adverse rulings or other developments that prejudiced the preparation of his defense. Furthermore, during the 10 months he was represented by appointed counsel prior to trial, Harris does not point to any occasion on which counsel ever asked for and were refused the opportunity to revisit any motions or rulings made during the time Harris proceeded *pro se*.

¶ 78    Therefore, this case is clearly unlike those in which criminal defendants were unrepresented for the entirety of their criminal prosecution. See *People v. Lego*, 168 Ill. 2d 561 (1995). But since even a short period of self-representation can give rise to a

_____

[7]Harris raises an additional argument regarding another witness who looked out the window of her trailer home across the street from the liquor store after the shootings. She claimed she saw a "suspicious" man standing behind a street sign looking into the store. The lack of relevance of this testimony is so obvious that we will not separately address it.

constitutional claim if it occurs during a " 'critical stage' " of criminal proceedings (*People v. Vernon*, 396 Ill. App. 3d 145, 154 (2009)), we will examine Harris's claim that he is entitled to postconviction relief because he was not competent to waive his right to counsel.

¶ 79 Before a court accepts a waiver of counsel, it must determine that the defendant is competent to stand trial and that the waiver of counsel has been knowingly and voluntarily made. *Godinez v. Moran*, 509 U.S. 389, 400 (1993); see also *People v. Kidd*, 178 Ill. 2d 92, 104 (1997). A knowing and voluntary waiver requires a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it. *Kidd*, 178 Ill. 2d at 104-05. In connection with allowing a defendant to proceed *pro se*, the trial court must determine, in open court, that the defendant understands the nature of the charge, the minimum and maximum sentence proscribed by law, and that he has a right to have counsel appointed if he is indigent. Ill. S. Ct. R. 401(a) (eff. July 1, 1984). The record amply reflects the trial court's strict adherence to the foregoing requirements.

¶ 80 It is axiomatic that the prosecution of a defendant who is not fit to stand trial is a violation of due process. See *People v. Easley*, 192 Ill. 2d 307, 318 (2000) (and cases cited therein). A defendant is presumed to be fit to stand trial, and is only entitled to a fitness hearing when a *bona fide* doubt regarding the defendant's fitness is raised. *Id.* A defendant will be considered unfit only if, because of the defendant's physical or mental condition, the defendant is unable to understand the nature or purpose of the proceedings and assist in his or her defense. *Id.* Relevant factors that may be considered by the trial court in assessing whether a *bona fide* doubt regarding fitness exists include a defendant's irrational behavior, demeanor at trial, and any prior medical opinion on defendant's fitness to stand trial. *Id.* at 318-19.

¶ 81 If a defendant who is fit to stand trial has determined to waive the right to counsel, a trial court must accede to that request. "Although a court may consider a defendant's decision to represent himself unwise, if his decision is freely, knowingly, and intelligently made, it must be accepted out of 'that respect for the individual which is the lifeblood of the law.' " (Internal quotation marks omitted.) *Lego*, 168 Ill. 2d at 563-64 (quoting *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970)). Once the court has assured itself that the waiver is valid, it may not force a defendant to continue to be represented by counsel he does not want. *Faretta v. California*, 422 U.S. 806, 833-34 (1975).

¶ 82 Harris is entitled to relief on this postconviction claim only if the facts in his petition make a substantial showing that the trial court would have ordered a fitness hearing if it had been apprised of the evidence now offered. *Easley*, 192 Ill. 2d at 319. In support of his claim, Harris submitted two affidavits from Dr. Robert Hanlon. Dr. Hanlon attested that Harris suffered four significant incidents of head trauma in his lifetime. Moreover, neurocognitive testing results indicated three categories of mild to moderate neurocognitive impairment in the following areas: (1) attention and information processing, (2) memory, and (3) executive functioning. Finally, testing demonstrated a large difference between Harris's verbal and nonverbal IQ scores. Dr. Hanlon is of the opinion "to a reasonable degree of neuropsychological certainty," that at the time he waived his right to counsel Harris "could not have been able to understand the dangers and disadvantages of representing himself, nor could he have been fully aware of the consequences of proceeding without a lawyer."

-16-

¶ 83	Although the State contends that Dr. Hanlon's findings "to a reasonable degree of neuropsychological certainty" utilize an invalid standard (a contention that may well be correct), we note that even if we take as true Dr. Hanlon's opinion that Harris suffers from cognitive impairments, this does not compel the conclusion that Harris has raised a *bona fide* doubt as to his fitness to stand trial. "Fitness speaks only to a person's ability to function within the context of a trial. It does not refer to sanity or competence in other areas. A defendant can be fit for trial although his or her mind may be otherwise unsound." *Id.* at 320. The relevant inquiry is whether Harris was able to understand the nature of the proceedings and participate in his defense.

¶ 84	Nor is it necessary, as Harris contends, to weigh the credibility of Dr. Hanlon's versus Dr. Seltzberg's opinions in order to reach this result. Given that Harris represented himself for over a year, during which time he filed motions, appeared before the trial court numerous times and deposed a number of witnesses, the record provides ample evidence that Harris understood the nature of the proceedings against him and was able to participate in his defense. Despite the voluminous record on appeal, Harris has not identified a single occasion upon which he said or did anything indicating that he was delusional or otherwise out of touch with reality. Indeed, the record demonstrates otherwise.

¶ 85	Unlike the defendant in *Lego*, who informed the court that he had " '40-years experience' " in representing himself and others and believed that his legal skills equaled or exceeded those of any attorney (*Lego*, 168 Ill. 2d at 565), Harris had no such illusions. He recognized that representing himself put him at a disadvantage, complained that it was "unfair," and ultimately requested appointed counsel precisely because he recognized he could not effectively represent himself at trial. The record also shows that Harris's lack of cooperation with his initial counsel and his refusal to participate in the mitigation evidence portion of his trial with subsequent counsel was not due to his unfitness, but, rather, to his personal antipathy toward his initial counsel and his conscious decision to refrain from presenting any evidence in mitigation.[8] "Defendant's unwillingness to cooperate with counsel cannot be deemed equivalent with an inability to do so." (Internal quotation marks omitted.) *Id.* (quoting *People v. O'Neal*, 62 Ill. App. 3d 146, 149 (1978)). Harris was clearly not delusional.

¶ 86	Finally the record flatly refutes the notion that Harris could not knowingly and intelligently waive his right to counsel because neurocognitive impairments rendered it impossible for him to understand the risks and disadvantages of representing himself. When Harris first informed the court of his desire to proceed *pro se*, the court urged him to reconsider his decision and continued the case for several weeks. When he returned, Harris advised the court that he had reconsidered given his lack of regular access to the library and law books. Thus, Harris clearly understood that there would be disadvantages in proceeding

---

[8]As we have already observed (*supra* ¶ 34 n.2), Harris's decision to refrain from presenting evidence in mitigation can be readily explained by the fact that, as noted by our supreme court, such evidence would not have been helpful and, in some respects, would have proved detrimental to Harris in the sentencing phase.

without a lawyer and consciously chose to continue with his appointed counsel. After Harris was permitted to represent himself for a little over a year, he again informed the court that he did not believe he should continue to proceed without a lawyer and, at his request, private counsel represented him from that point through trial and sentencing.

¶ 87 Thus, Harris's own conduct demonstrates that he was acutely aware of the risks of self-representation, so much so that he reversed course and requested the appointment of counsel to represent him at trial. In the face of this record, it is impossible for Harris to make a substantial showing that he was either unfit for trial or incompetent to decide to waive counsel.

¶ 88 Given our conclusion that Harris was competent to waive counsel and that he did so knowingly and voluntarily, it follows that the trial court did not err in failing to hold a fitness hearing and Harris's counsel was not ineffective for failing to request one.

¶ 89 For the reasons stated herein, we hold that the circuit court did not err in granting the State's motion to dismiss Harris's postconviction petition and we affirm the judgment of the circuit court.

¶ 90 Affirmed.